2005 UT 68

**Jau–Fei CHEN, individually and as the natural guardian of Chi Wei Zhang, E. Lei Zhang, and E.E. Zhang, her minor children, Plaintiff and Appellee,**

v.

**Jau–Hwa STEWART, E. Excel International, Inc., a Utah corporation, and Does I through X, Defendants and Appellant.**

**E. Excel International, Inc., a Utah corporation, Third–Party Plaintiff,**

v.

**Taig Stewart; Hwan Lan Chen; Beverly Warner; Angela Barclay; Dale Stewart; Sam Tzu; Richard Hu; Apogee, Inc., a Utah corporation; Apogee Essence International Philippines, Inc., a Philippines corporation; Excellent Essentials**

---

International Corp., a Philippines corporation; USA Apogee, Ltd., a Hong Kong corporation; Shannon River, Inc., a Utah corporation; Shannon Heaton; Sheue Wen Smith; Bryan Hyman; Paul Cooper; Kim O'Neill; Byron Murray; and Does I through X, Third–Party Defendants and Cross–Appellants.

No. 20020777.

Supreme Court of Utah.

Oct. 21, 2005.

**420**

Michael R. Carlston, Richard A. Van Wagoner, David L. Pinkston, R. Matthew Cox, Salt Lake City, for Jau–Fei Chen.

Mark A. Larsen, Jon K. Stewart, David S. Hill, Stacy J. McNeill, Salt Lake City, for Jau–Hwa and Taig Stewart.

Daniel L. Berman, Samuel O. Gaufin, Stephen R. Waldron, Eric K. Schnibbe, Salt Lake City, and H. Thomas Stevenson, Ogden, for Hwan Lan Chen.

PARRISH, Justice:

## INTRODUCTION

¶ 1 This case arises from a dispute among members of a traditional Chinese family. The dispute eventually led to sabotage of the family business, protracted litigation, and allegations of conspiracy to commit perjury and obstruction of justice. Following extensive hearings, the district court held defendant Jau–Hwa Stewart ("Ms.Stewart") in criminal and civil contempt for violation of its orders, perjury, subornation of perjury, and obstruction of justice. It is the validity of this contempt order that is at issue in this appeal. For the reasons detailed below, we affirm in part, reverse in part, and remand.

## FACTUAL BACKGROUND[1]

¶ 2 In 1987, Dr. Jau–Fei Chen ("Dr. Chen"), her husband Rui Kang Zhang, and her parents Hwan Lan Chen ("Madame Chen") and Yung–Yeuan Chen incorporated E. Excel USA ("Excel"), a multilevel marketing company that produced nutritional supplements and other health related products. Dr. Chen became Excel's president and sole shareholder, receiving six thousand shares of Excel stock at the time of its incorporation.

¶ 3 In the early 1990s, Ms. Stewart, Dr. Chen's elder sister, was invited to join the company as its vice president, in part to capitalize on the knowledge Ms. Stewart had

---

1. On appeal from a contempt order following an evidentiary hearing, we recite the evidence in a light consistent with the trial court's factual findings unless the findings are clearly erroneous. *See Von Hake v. Thomas,* 759 P.2d 1162, 1172 (Utah 1988) ("On review of both criminal and civil proceedings, we accept the trial court's findings of fact unless they are clearly erroneous."). Our recitation of the facts is limited to those directly relevant to the issues presented in this particular appeal. For a more thorough recitation of the facts of this case, see *Chen v. Stewart,* 2004 UT 82, ¶¶ 2–17, 100 P.3d 1177.

gained while working for another multilevel marketing company. Ms. Stewart accepted the invitation, was appointed to Excel's board of directors, and thereafter began overseeing Excel's day-to-day operations. In 1995, Dr. Chen transferred 1500 shares of stock to Ms. Stewart in order to ensure that she would be "devoted to the company." At the same time, Dr. Chen transferred her remaining 4500 shares of stock to her three minor children, giving each 1500 shares. As a result of these transfers, the Chen children owned, collectively, a 75% interest in Excel, and Ms. Stewart owned a 25% interest.

¶ 4 As a multilevel marketer, Excel entered into exclusive distributorship contracts with territorial owners in its Asian markets, who would, in turn, distribute Excel products through use of a multilevel marketing network by enlisting "registered distributors" to sell its products to consumers. Through the years, Excel entered into exclusive distributorship contracts with territorial owners located throughout several Asian and Southeast Asian countries, including Malaysia, Taiwan, Hong Kong, and the Philippines.

¶ 5 Working together, Dr. Chen and Ms. Stewart created a successful company with markets throughout the world. But their business and personal relationships deteriorated dramatically during the spring of 2000, when Ms. Stewart and her mother, Madame Chen, learned that Dr. Chen's husband was having an affair and had been diverting company funds to support his mistress. Upon learning this information, Madame Chen and Ms. Stewart confronted Dr. Chen, demanding that she divorce her husband and sever all ties with him. When Dr. Chen refused, Madame Chen and Ms. Stewart designed a Machiavellian scheme to divest Dr. Chen of control of Excel.

¶ 6 On September 1, 2000, while Dr. Chen was out of the country, Ms. Stewart set in place her plan to usurp control of Excel. Her first step was to gain control over the voting shares of stock. She did this by purportedly acting on behalf of Dr. Chen's three minor children, thus giving her a combined 100% ownership of the voting shares of stock. Exercising the voting rights of this stock, Ms. Stewart removed Dr. Chen and Mr. Zhang as directors of Excel, appointing in their stead Ms. Stewart's husband and Madame Chen. With the new board in place, the directors voted to remove both Dr. Chen and her husband from their respective positions at Excel. Finally, the board named Ms. Stewart as Excel's new president and Ms. Stewart's husband as secretary.

¶ 7 During her tenure as president of Excel, Ms. Stewart undertook a series of maneuvers designed to eliminate the influence of, and any loyalty to, Dr. Chen. For instance, during a meeting with the territorial owners of Malaysia and Taiwan, Mr. Tjandra and Mr. Le, respectively, Ms. Stewart falsely reported that Dr. Chen had left Excel in pursuit of other matters. When Mr. Tjandra and Mr. Le refused to believe that Dr. Chen would voluntarily leave the company and asked to speak with Dr. Chen directly, Ms. Stewart responded by attempting to convince the territorial owners that Dr. Chen's presence in the company was not essential to its success. Despite her attempts to persuade the territorial owners, it became evident to Ms. Stewart that Mr. Tjandra and Mr. Le would continue to remain loyal to Dr. Chen. Accordingly, Ms. Stewart terminated Excel's exclusive distributorships with these territorial owners and began new distributorships in the Philippines and Hong Kong with Mr. Hu and Mr. Tzu, individuals loyal to her.

¶ 8 To ensure that these new "rogue" distributorships would prosper, Ms. Stewart arranged to have substantial sums of money sent to Mr. Hu and Mr. Tzu. She also forbade Excel employees to ship Excel products to either Mr. Tjandra or Mr. Le, the consequence of which "was that down-line distributors in the multi-level marketing chain, in order to survive financially, would of necessity defect to the new distribution companies." Furthermore, Ms. Stewart shipped the new distributors Excel products at no charge.

¶ 9 In early January 2001, Dr. Chen filed suit against Ms. Stewart and Excel, alleging, among other things, corporate waste, breach of fiduciary duty, and invalid removal of a corporate director. Additionally, Dr. Chen moved for a temporary restraining order and an order to show cause why the temporary restraining order should not remain in effect

as a preliminary injunction during the pendency of the case. The district court granted the temporary restraining order on January 10, 2001. As modified by the district court, the temporary restraining order provided as follows:

> The Defendant Stewart, her agents, servants, representatives, and any persons in active concert or participation with her are enjoined and restrained: (1) from acting as a trustee of the [trusts benefitting Dr. Chen's children]; [and] (2) from directly or indirectly causing the Company to violate any of its exclusive contracts with territorial owners or to compete with territorial owners in violation of such contracts. The Court also enjoins and directs [Ms.] Stewart immediately to fill, complete and ship all pending orders for products received from Territorial Owners where such Territorial Owners have complied with the terms of the exclusive contracts.

Ms. Stewart was properly served with the temporary restraining order on January 11, 2001, and on January 24, 2001, the district court extended the temporary restraining order without objection.

¶ 10 In direct violation of the temporary restraining order, Ms. Stewart refused to fill the many orders received from Mr. Tjandra and Mr. Le. Indeed, after the district court granted the temporary restraining order, Ms. Stewart neither informed the employees at Excel of the terms of the temporary restraining order nor rescinded her order forbidding shipment of Excel products to Mr. Tjandra and Mr. Le. At the same time, Ms. Stewart oversaw shipments of Excel products to the rogue distributors. At a time when Ms. Stewart, as president of Excel, had the authority to recall any shipments in transit, she allowed at least two shipments to be sent to Mr. Tzu and Mr. Hu in direct violation of the restraining order.

¶ 11 From January 19, 2001, to February 21, 2001, the district court held evidentiary hearings regarding Dr. Chen's order to show cause why the temporary restraining order should not remain in effect as a preliminary injunction during the pendency of the case. During these proceedings, it became apparent to Ms. Stewart that she would not be allowed to remain as Excel's president. Consequently, she modified her plan to force Dr. Chen out of Excel, opting instead to destroy the entire company by creating a competitor that would force Excel out of its Asian markets.

¶ 12 To this end, Ms. Stewart, with the aid of several accomplices, undertook a number of acts designed to "[d]estroy Excel." These acts included (1) "the removal of Excel ... property," such as computer equipment, office furniture, file cabinets, desks, and chairs; (2) the deletion of e-mails and the removal of other company documents, including laboratory and toxicology reports; (3) the formation of a competing enterprise, Apogee, Inc.; (4) the removal of Excel products and raw materials; and (5) the sabotage of Excel products. Additionally, Ms. Stewart, through her agents, continued to ship Excel products to Mr. Hu and Mr. Tzu for the dual purposes of (1) providing them with sufficient product to sustain their rogue distributorships until Apogee was able to market its own product, and (2) impairing Excel's ability to sell its product through its normal distribution channels by "dumping the product and undercutting the Territorial Owners' sales."

¶ 13 At the conclusion of the preliminary injunction hearings, the parties stipulated to an interim order, which provided in part:

> 12. [Ms.] Stewart shall not tortiously interfere directly or indirectly with any contract determined by the Court at any time to exist between the Company and any distributor or any third party.

> 13. [Ms.] Stewart will immediately return to the Company's headquarters any corporate assets in her custody or control including but not limited to all corporate records. A receipt shall be provided by the Company to [Ms.] Stewart for any item so returned.

¶ 14 The interim order also provided for the appointment of a special master to serve as Excel's CEO during the pendency of the litigation. Because the parties could not agree as to who should serve as special master, the district court appointed Larry Hol-

man, "empowering him as interim CEO/special master with full executive authority to act on behalf of the company, and conduct its business, subject to the continuing oversight of the board of directors and the Court." *Chen v. Stewart*, 2004 UT 82, ¶ 9, 100 P.3d 1177 (internal quotations omitted).

¶ 15 Just as she had violated the temporary restraining order, Ms. Stewart violated the terms of the interim order by continuing her efforts to create a successful competitor. For example, in the spring of 2001, Ms. Stewart and others consulted with and hired a general contractor for the express purpose of constructing a facility that would house the new company's operations. On April 17, 2001, Ms. Stewart, through the use of an agent, filed with the State a request to register the business name "Apogee, Inc." Thereafter, Apogee entered into a contract with Mr. Hu, a rogue distributor, granting him the exclusive right to distribute Apogee products in the Philippines. Additionally, in the fall of 2001, Apogee began advertising its competing products in Excel's established markets.

¶ 16 Because of what she considered to be Ms. Stewart's contemptuous conduct, including the continued violation of the temporary restraining and interim orders, Dr. Chen filed two motions for contempt against Ms. Stewart.[2] The first, filed on June 22, 2001, sought to hold Ms. Stewart in civil and criminal contempt for violation of the district court's orders. The second, filed August 2, 2001, requested that the district court summarily hold Ms. Stewart in criminal contempt for obstruction of justice on the basis of a tape recording introduced into evidence during the preliminary injunction hearings. The recording allegedly captured a conversation evidencing a conspiracy among Ms. Stewart, Mr. Hu, and Mr. Tzu to commit perjury and obstruct justice.

¶ 17 On October 29, 2001, Excel, under the direction of the court-appointed interim CEO/special master, filed an amended answer, cross-claim, and third-party complaint against Ms. Stewart, Madame Chen, and oth-

ers, seeking a preliminary and permanent injunction to enjoin them from engaging in any further competition with Excel. On October 31, 2001, the district court granted Excel's request for a temporary restraining order, enjoining Ms. Stewart and other third-party defendants acting in concert with Ms. Stewart from "competing or preparing to compete against Excel." On November 8, 2001, the district court extended indefinitely the temporary restraining order pursuant to a stipulated order. Madame Chen accepted service of Excel's amended answer, cross-claim, and third-party complaint on January 15, 2002.

¶ 18 The district court began hearings on the contempt motions on October 25, 2001. On November 27, 2001, the court combined the contempt hearings with the hearings on Excel's motion for a preliminary injunction. These combined hearings concluded in the summer of 2002. On August 20, 2002, the district court entered extensive findings of fact and conclusions of law on Dr. Chen's motions to hold Ms. Stewart in contempt and on Excel's motion for a preliminary injunction.

¶ 19 As to Dr. Chen's first contempt motion, the district court held that Ms. Stewart violated the court's temporary restraining and interim orders when she (1) "failed to fill confirmed orders of Territorial Owners despite knowing what was required, and having the ability to fulfill such orders"; (2) "intentionally caused and allowed shipments of product within her control to be shipped to Messrs. Hu and Tzu ... despite knowing what was required and having the ability not to ship such product"; (3) "knowingly and intentionally retained [corporate assets that were the property exclusively of Excel] despite knowing what was required and having the ability to immediately return said property to Excel"; and (4) "undertook to prepare for and cause competition with Excel ... despite knowing what was required and having the ability not to prepare for and cause competition with Excel."

---

**2.** In *Chen*, 2004 UT 82, ¶ 70, 100 P.3d 1177, we incorrectly stated that the contempt motions were filed against both Ms. Stewart and Madame Chen. In fact, the contempt motions filed by Dr. Chen sought to hold only Ms. Stewart in contempt.

¶ 20 As to Dr. Chen's second contempt motion, the district court found that Ms. Stewart committed perjury, suborned perjury, and obstructed justice. This conclusion was based in part on the substance of the tape recording that was admitted into evidence during the preliminary injunction hearings. According to Dr. Chen, the tape recording was anonymously sent to her husband's home in Singapore in early February 2001. After receiving the recording, Dr. Chen's husband made one copy and then forwarded the original to Dr. Chen's counsel, who received it on February 13, 2001, the same day Mr. Hu was scheduled to testify in the preliminary injunction hearing. On the tape, three individuals, presumed to be Ms. Stewart, Mr. Hu, and Mr. Tzu, are heard discussing the substance of their testimonies, agreeing that each would, among other things, (1) falsely accuse Dr. Chen of forging documents; (2) deny involvement in setting up the new distributorships; (3) deny that Ms. Stewart had loaned money to Mr. Hu in order to set up a new distributorship, although the parties acknowledged that Ms. Stewart had indeed loaned Mr. Hu substantial funds for that purpose; and (4) answer all questions that may be detrimental to Ms. Stewart's interest with the phrase "I cannot remember."

¶ 21 Although none of the parties claimed to know the source of the recording, the device that was used to record the conversation, or the location of the interception, the district court allowed Dr. Chen's counsel to present Mr. Hu with a transcript of the recording. After looking over the transcript, Mr. Hu admitted to having a conversation with Ms. Stewart but stated that he did not remember whether Mr. Tzu was a party to that conversation. To refresh Mr. Hu's recollection, counsel for Dr. Chen then played a portion of the recording for Mr. Hu, who subsequently identified the voices on the tape as his, Ms. Stewart's, and Mr. Tzu's. When asked whether the tape recording accurately reflected the conversation, Mr. Hu refused to answer on Fifth Amendment grounds. Under questioning by Ms. Stewart's counsel, Mr. Hu admitted that he had been in Taiwan when the conversation took place, but he denied having ever given consent to have the conversation recorded.

¶ 22 Ms. Stewart argued that the recording should not be admitted into evidence because Dr. Chen failed to establish its authenticity and the recording was subject to exclusion because it was made in violation of both Utah and federal wiretap statutes. The district court rejected these arguments, concluding that Mr. Hu's identification of the voices, his testimony that he had a conversation with Ms. Stewart and Mr. Tzu, and the adverse inference drawn from Mr. Hu's assertion of his Fifth Amendment rights provided sufficient foundation for admission of the recording. The district court further ruled that the recording was admissible for impeachment purposes despite the fact that the interception may have violated either Utah or federal wiretap exclusionary rules.

¶ 23 Although the district court initially admitted the recording for impeachment purposes only, it later considered the recording as substantive evidence. Indeed, the district court relied on the recorded conversation, as well as on a document submitted to a court in Hong Kong [3] and Ms. Stewart's subsequent testimony, in concluding that Ms. Stewart had committed perjury and obstructed justice. The district court then granted Dr. Chen's contempt motion and entered an order striking Ms. Stewart's pleadings as a sanction for her contemptuous conduct ("Stewart Contempt Order").

¶ 24 On the same day that the district court entered its findings of fact on the Stewart Contempt Order, it also entered nearly eighty-nine pages of findings on Excel's motion for a preliminary injunction and, in addition, stated that "[a]ll findings of fact made by this Court in respect to [Dr.] Chen's Motion for Order to Show Cause and Motion for Summary Criminal Contempt are . . .

---

3. In her third signed affirmation to a Hong Kong court, Ms. Stewart stated, "I wish to deal briefly with the tape recording of my conversation with Mr. Hu and Mr. Tzu, leaving aside the question of how such a recording was obtained by the Defendants. First of all, I regret very much if I did anything which may have misled the Utah court. At the time, we were all so angry with the 5th Defendant."

hereby incorporated as findings for purposes of [ ] Excel's Motion for Preliminarily Injunction as well."

¶ 25 After the district court entered the Stewart Contempt Order and granted Excel's motion for a preliminary injunction, Madame Chen filed a motion to vacate and set aside the district court's orders relating to the appointment of the interim CEO, a motion in which Ms. Stewart joined. The district court denied the motion, and defendants sought permission to appeal the interlocutory order. We granted permission to hear the interlocutory appeal and held that defendants "waived their right to object to the appointment of the interim CEO." *Chen v. Stewart*, 2004 UT 82, ¶ 84, 100 P.3d 1177. In so holding, we recognized that, in appointing the special master, "the parties understood that the interim CEO was not appointed as a neutral judicial magistrate." *Id.* ¶ 58. We further held that the district court had not abused its discretion in granting the preliminary injunction. *Id.* ¶ 84.

¶ 26 In this appeal, Ms. Stewart challenges the order finding her in criminal and civil contempt. She asserts that the district court erred by considering and relying on a tape recording that was admitted without adequate foundation. Additionally, Ms. Stewart challenges the district court's inherent authority to strike her pleadings as a sanction for contempt. In the alternative, she asserts that even if the court had such authority, it nevertheless abused its discretion by striking her pleadings when the results of her contemptuous conduct could have been otherwise remedied. Finally, both Ms. Stewart and Madame Chen argue that, during the contempt proceedings, the district court violated their due process rights by denying them the right to a fair hearing before an impartial magistrate. We address each issue in turn.

## ANALYSIS

### I. DID THE DISTRICT COURT ERR IN ADMITTING THE TAPE RECORDING?

¶ 27 Ms. Stewart argues that the district court erred in admitting the tape re-cording into evidence because Dr. Chen failed to establish the requisite foundation. "A [district] court has broad discretion to admit or exclude evidence and its determination typically will only be disturbed if it constitutes an abuse of discretion." *State v. Whittle*, 1999 UT 96, ¶ 20, 989 P.2d 52; *see also State v. Cruz–Meza*, 2003 UT 32, ¶ 8, 76 P.3d 1165 ("Although the admission or exclusion of evidence is a question of law, we review a [district] court's decision to admit or exclude specific evidence for an abuse of discretion.").

¶ 28 Rule 901 of the Utah Rules of Evidence provides that a proponent of evidence must, as a "condition precedent to admissibility," demonstrate "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Utah R. Evid. 901(a). Although this court has yet to articulate any specific test with regard to establishing the authenticity of a tape recording, other jurisdictions have done so. For example, in *State v. Smith*, 85 Wash.2d 840, 540 P.2d 424 (1975), the Washington Supreme Court held that a party must satisfy seven factors in order to establish authenticity of an audio-tape:

(1) It must be shown that the mechanical transcription device was capable of taking testimony. (2) It must be shown that the operator of the device was competent to operate it. (3) The authenticity and correctness of the recording must be established. (4) It must be shown that changes, additions, or deletions have not been made. (5) The manner of preservation of the record must be shown. (6) Speakers must be identified. (7) It must be shown that the testimony elicited was freely and voluntarily made, without any kind of duress.

*Id.* at 428 (internal quotations omitted).

¶ 29 Other jurisdictions have refused to adopt such a rigid rule, declaring that " 'the varying circumstances of particular cases . . . militate against [the] adoption of inflexible criteria applicable to all cases.' " *United States v. Smith*, 692 F.2d 693, 698 (10th Cir.1982) (quoting *United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir.1977)). In *United States v. King*, 587 F.2d 956 (9th Cir.1978), the Ninth Circuit stated as follows:

426

[W]e think that the [seven] elements, ... are useful, but not dispositive, guidelines for determining when a proper foundation for the introduction of sound recordings has been made. Ultimately, the trial court, in the exercise of its judicial discretion, must be satisfied that the recording is accurate, authentic, and generally trustworthy.

*Id.* at 961.

¶ 30 Recognizing the hazards that accompany the adoption of an inflexible rule, we embrace the Ninth Circuit's approach in *King.* Accordingly, to establish the requisite foundation for admissibility of a tape recording, we hold that the proponent of the recording must produce evidence sufficient to persuade the district court "that the recording is accurate, authentic, and generally trustworthy." *Id.* While a proponent may find it beneficial to demonstrate most, if not all, of the factors discussed in *State v. Smith,* 85 Wash.2d 840, 540 P.2d 424, at 428 (1975),

4. This court has recognized that a district court may draw an adverse inference from a party's assertion of his Fifth Amendment right in a civil case. *See Gerard v. Young,* 20 Utah 2d 30, 432 P.2d 343, 343, 346–47 (1967). This principle has been extended in certain instances to apply to nonparty witnesses as well. *See, e.g., Pyles v. Johnson,* 136 F.3d 986, 997 (5th Cir.1998) ("We have held that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them. The same is true regarding an invocation of the privilege by a non-party witness in a civil action." (internal quotations and citations omitted)). Because we need not reach the issue of whether the district court erred in drawing an adverse inference from Mr. Hu's silence, we decline to identify those instances in which it is proper to draw such an inference from a nonparty's assertion of his Fifth Amendment right.

5. The district court concluded that it was not necessary for it to determine whether the tape was subject to exclusion under the wiretap statutes because it was under the assumption that even illegally obtained wiretaps are admissible for impeachment purposes. This assumption is incorrect. Although an illegal wiretap may be admitted to impeach a criminal defendant's testimony, this impeachment exception to the federal wiretap exclusionary rule does not extend to civil cases. *See Forsyth v. Barr,* 19 F.3d 1527, 1541 n. 28 (5th Cir.1994); *Williams v. Poulos,* 11 F.3d 271, 287–88 (1st Cir.1993); *United States v. Wuliger,* 981 F.2d 1497, 1505–06 (6th Cir.1992). *But*

he is not required to do so as long as the evidence is otherwise sufficient.

¶ 31 In this case, the district court found, due in part to the adverse inference it drew from Mr. Hu's assertion of his Fifth Amendment right,[4] that Dr. Chen had satisfied her burden of establishing the tape's authenticity and that the tape was therefore admissible for impeachment purposes. The district court did so, however, without any evidence as to who recorded the tape, where it was recorded, the method of recording, its chain of custody, or whether it had been altered in any fashion. Accordingly, the district court was unable to determine whether the tape was subject to exclusion under either Utah or federal wiretap statutes.[5]

¶ 32 Although the issue of a recording's authenticity is distinct from the issue of whether it is subject to exclusion under the wiretap statutes, there is considerable overlap between the two because both generally require evidence of the recording's origin.

*see Culbertson v. Culbertson,* 143 F.3d 825, 828 (4th Cir.1998) (holding that the impeachment exception applied in a divorce proceeding). For example, in *Williams,* the court declared that

the allowance of an impeachment exception [to the federal wiretap exclusionary rule] derives from the references in the legislative history to search and seizure law.... [B]ecause normal search and seizure laws have arisen in the context of the Fourth Amendment which is directed against the government, not against private individuals, and because the Fourth Amendment does not apply in civil actions not involving the government, these courts have ... declined to recognize an impeachment exception to § 2515 in civil proceedings.

11 F.3d at 287 (internal quotations and citations omitted).

Also, in *Wuliger,* the court stated that

we refuse to recognize an impeachment exception to section 2515 in civil proceedings. The greater value to society to learn the truth in criminal cases where it may be discovered by impeaching materials, even if unlawfully obtained, may outweigh the individual rights to privacy. While in the civil context, it is principally the individual rights that are at issue and Congress has balanced the scale in favor of the right of privacy.

981 F.2d at 1506.

We find the reasoning of the federal courts persuasive and accordingly conclude that any impeachment exception to the Utah wiretap exclusionary rule does not extend to civil cases.

In short, to assess the adequacy of the evidentiary foundation for admission of the recording, we must consider that evidence in light of the wiretap exclusionary rules.

¶ 33 Pursuant to the Utah wiretap exclusionary rule, section 77–23a–7 of the Utah Code, a party may exclude "any wire, electronic, or oral communication [that] has been intercepted ... if the disclosure of that information would be in violation of [the Utah Interception of Communications Act (the "Act")]." Utah Code Ann. § 77–23a–7 (2003).[6] Except as otherwise provided, an individual not acting under color of law violates the provisions of the Act if he intercepts a communication to which he is not a party and he did not have prior consent from one of the parties to do so. Id. § 77–23a–4(7)(b). Although the Act's exclusionary rule does not specify which party carries the burden of proof, we conclude that, just as with the federal wiretap exclusionary rule, the aggrieved party carries the burden of establishing that the interception violates the Act. See United States v. Phillips, 540 F.2d 319, 326 (8th Cir.1976) (recognizing that "[l]ogic requires that the party against whom the evidence is offered ... carry the ultimate burden of alleging and proving the specific criminal, tortious, or other injurious purpose for which the interception was made").

¶ 34 To satisfy this burden of proof, an aggrieved party may typically draw on the foundational evidence presented by the proponent of the recording. But in this case, admission of the. tape, despite Dr. Chen's failure to produce any evidence as to the origin of the recording, the identity of the interceptor, or the location of the interception, essentially shifted the burden of laying foundation for the recording from its proponent to its opponent and rendered it practically impossible for Ms. Stewart to meet the burden of proof on her motion to suppress. Indeed, admission of the tape under such circumstances prevented Ms. Stewart from availing herself of the wiretap exclusionary rules. This is an outcome we cannot accept. Because Dr. Chen failed to offer any evidence of the tape's origin or authenticity, we hold that the district court abused its discretion in admitting it.[7]

## II. DID THE DISTRICT COURT HAVE INHERENT AUTHORITY TO STRIKE MS. STEWART'S PLEADINGS AS A SANCTION FOR CONTEMPT?

¶ 35 Ms. Stewart also contends that the district court did not have the authority to strike her pleadings as a sanction for contempt based on her violation of the court's orders and its finding that she committed perjury and obstructed justice. We disagree.

¶ 36 A court's authority to sanction contemptuous conduct is both statutory and inherent. See Utah Code Ann. §§ 78–32–1 to –17 (2002) (detailing the procedures governing contempt); In re Evans, 42 Utah 282, 130 P. 217, 224 (1913) ("It is undoubtedly true that courts of general and superior jurisdiction possess certain inherent powers not derived from any statute. Among these are the power to punish for contempt....").

6. The federal counterpart to Utah's wiretap exclusionary rule is found in 18 U.S.C. § 2515, which provides, in part, as follows:
   Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court ... if the disclosure of that information would be in violation of this chapter.
   18 U.S.C. § 2515 (2004).

7. In arguing that the tape was properly admitted, counsel for Dr. Chen suggests that counsel's duty of candor toward the tribunal actually required counsel to bring the tape to the attention of the court. We have no quibble with this proposition. However, the fact that counsel is obligated to disclose to the court information bearing on the integrity of the proceedings does not mean that such information is necessarily admissible in evidence.

Counsel for Dr. Chen further asserts that Ms. Stewart waived her right to object to admission of the tape by offering into evidence her own translation of the recording. We disagree. At the time Ms. Stewart offered the alternate translation, the court had already admitted the tape over Ms. Stewart's objection. The alternative translation was submitted for purposes of damage control and did not reflect Ms. Stewart's acquiescence with respect to the admissibility of the underlying recording.

In Utah, statutory provisions restrict both the amount of a fine and the length of a jail sentence that may be imposed as a sanction for contempt. Utah Code Ann. § 78–32–10. These statutory provisions, however, do not encroach upon the judiciary's inherent authority to punish contemptuous conduct by means other than the penalties described by section 78–32–10. Rather, "to the extent the common law [governing contempt] [is] not inconsistent with the statutes, it survives and can continue to evolve." *Von Hake v. Thomas*, 759 P.2d 1162, 1167 (Utah 1988); *see also People ex rel. Pierce v. Carrington*, 5 Utah 531, 17 P. 735, 737 (1888) ("[C]ourts may go beyond the power given by statute in order to preserve and enforce constitutional powers when acts in contempt invade them."). This inherent authority, however, is not without limitation. A court's authority to "hold any person in contempt, whether a party to a case before that court or a non-party, is subject to constitutional and statutory restraints regarding the process due to any person so accused." *Crank v. Utah Judicial Council*, 2001 UT 8, ¶ 25, 20 P.3d 307.

¶ 37 The United States Supreme Court has recognized that the demands of due process may limit a court's authority to sanction contemptuous conduct. In *Hovey v. Elliott*, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897), the Court held that the act of striking a defendant's answer simply because he failed to comply with the court's order to pay a certain sum into the court's registry violated "an essential element of due process of law." *Id.* at 444, 17 S.Ct. 841. In contrast, in *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909), the Court concluded that the district court did not violate due process when it struck the defendant's answer after the defendant refused to comply with the court's discovery order. *Id.* at 351, 29 S.Ct. 370. In distinguishing *Hovey*, the *Hammond* Court declared that "the preservation of due process was secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense." *Id.*

¶ 38 Ms. Stewart contends that, pursuant to *Hovey* and *Hammond*, a court's inherent power to strike the pleadings of a party is limited to those instances where the sanction is designed to coerce compliance with a discovery order. She further contends that the sanctions imposed in this case were designed to punish her, rather than to coerce her compliance with court orders, and therefore exceeded the authority of the district court. We disagree.

¶ 39 The holding in *Hovey* "was based principally on the notion that a party should not be deprived of his opportunity to defend based on factors *unrelated to the merits* of his case." *Phoceene Sous–Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir.1982) (emphasis added). The holding of *Hammond* was "premised on the idea that one may reasonably infer from the suppression of relevant evidence that the defendant's case is lacking in merit." *Id.* Indeed, the *Hammond* Court likened the district court's authority to strike pleadings to "the authority to default ... because of a failure to answer, based upon a presumption that the material facts alleged or pleaded were admitted by not answering." 212 U.S. at 351, 29 S.Ct. 370.

¶ 40 The presumption underlying the ruling in *Hammond* applies with equal, if not greater, force to the intentional act of perpetrating a fraud on the court. "A 'fraud on the court' is 'an unconscionable plan or scheme which is designed to improperly influence the court in its decision.' " *Phoceene Sous–Marine*, 682 F.2d at 805 (quoting *England v. Doyle*, 281 F.2d 304, 309 (9th Cir. 1960)). The attempt to improperly influence the decision of the court by suborning perjury or obstructing justice yields a reasonable inference that the actor's claims or defenses lack merit. We accordingly conclude that the district court has the authority to strike pleadings as a sanction for an attempt to perpetrate a fraud on the court. As in *Hammond*, "the preservation of due process [is] secured by the presumption that the [perpetration of a fraud is] but an admission of the want of merit in the asserted defense." *Hammond*, 212 U.S. at 351, 29 S.Ct. 370.

¶ 41 Our interpretation of *Hammond* is supported by the case law of other jurisdictions holding that a court may strike a party's pleadings as a sanction for actions demonstrating bad faith. For example, in *TeleVideo Systems, Inc. v. Heidenthal,* 826 F.2d 915 (9th Cir.1987), the Ninth Circuit held that the district court did not deny the appellant due process when it struck his pleadings because the appellant had engaged in an "elaborate scheme involving perjury." *Id.* at 917. The court reasoned that the sanction of striking the appellant's answer and entering a default judgment was designed "not only to punish [the appellant], but to enable the court to proceed to hear and decide the case untainted by further interference and possible further perjury on the part of [the appellant]." *Id.; see also Kirby v. Adkins,* 582 So.2d 1209, 1211 (Fla.Dist.Ct.App.1991) ("[A] court has the inherent authority either to dismiss an action or to strike pleadings of a party who perpetrates a fraud on the court. [However, a question does] exist as to whether a party who commits fraud should be permitted to proceed on the merits of a legitimate portion of a claim.").

¶ 42 We find additional support for our interpretation of *Hammond* in those cases recognizing a distinction between sanctions imposed for conduct unrelated to the merits of a case and conduct that does relate to the merits. *See Phoceene Sous–Marine,* 682 F.2d at 806 (holding that because the "deception related not to the merits of the controversy but rather to a peripheral matter," the court erred in entering a default judgment); *Dubman v. N. Shore Bank,* 75 Wis.2d 597, 249 N.W.2d 797, 799 (1977) (holding that, "[i]f imposed solely for failure to obey court orders, without evidence warranting a finding of no merit or bad faith, the sanction of striking a pleading . . . denies due process of law").

¶ 43 In sum, a court has the inherent authority to strike a party's pleadings and enter a default judgment if the party engages in conduct designed to improperly influence the court's decision on the merits of the case, such as perjury or obstruction of justice, or if the conduct itself tends to demonstrate bad faith or a lack of merit.

## III. DID THE DISTRICT COURT ABUSE ITS DISCRETION IN STRIKING MS. STEWART'S PLEADINGS?

¶ 44 Having concluded that a district court possesses the power to strike the pleadings of a party in those circumstances where the party engages in acts giving rise to a reasonable inference that the party's case lacks merit, we now consider whether the district court properly exercised that power in this case. "An order relating to contempt of court is a matter that rests within the sound discretion of the [district] court." *Dansie v. Dansie,* 1999 UT App 92, ¶ 6, 977 P.2d 539. We accordingly review the sanctions imposed by the district court for an abuse of that discretion. Ms. Stewart argues that the district court did abuse its discretion because her contemptuous conduct was readily remediable through other, less severe sanctions. Because we conclude that it is necessary for the district court to reevaluate its contempt citation and the accompanying sanctions in light of our ruling that the tape recording was not admissible, we need not address this argument.

¶ 45 The district court struck Ms. Stewart's pleadings on the basis of its finding that Ms. Stewart had committed perjury and obstructed justice. While it is apparent from the district court's conclusions of law that the tape recording was not the sole basis for that finding, it nevertheless played a significant role in the district court's assessment. Because the district court erred in admitting the recording into evidence, we remand this case to the district court to reassess the contempt motion in light of the remaining evidence and to assess appropriate sanctions based on that evidence. On remand, if the district court finds that Ms. Stewart did, in fact, commit perjury and obstruct justice, we recognize that it is within the inherent authority of the court to strike her pleadings.

## IV. DID THE DISTRICT COURT VIOLATE MS. STEWART'S DUE PROCESS RIGHTS?

¶ 46 Ms. Stewart also claims that the district court's contempt citation violated

her due process rights by denying her the right to a fair trial before an impartial magistrate.[8] Specifically, Ms. Stewart claims that the district court's reliance on the testimony and reports of Mr. Holman, whom the district court had appointed as both special master and interim CEO of Excel, was improper because Mr. Holman could not simultaneously participate in the proceedings as a neutral judicial officer and a party litigant.

¶ 47 We recently considered and rejected this very claim in deciding the interlocutory appeal in this matter, *Chen v. Stewart*, 2004 UT 82, 100 P.3d 1177. We concluded that "the parties understood that the interim CEO was not appointed as a neutral judicial magistrate," *id.* ¶ 58, but was instead "appointed an interim CEO with the title of special master *only* for the purpose of providing him the judicial immunity associated with the designation," *id.* ¶ 56 (emphasis added). In addressing Ms. Stewart and Madame Chen's claim of bias, we stated:

> [A]ny confusion appears to have been manufactured after the fact rather than created by the court's order itself; no disagreement about Mr. Holman's powers surfaced until after his actions unfavorably affected defendants. Had Mr. Holman's designation as a special master led to an actual overlap of the quasi-judicial powers of a traditional rule 53 special master and the executive powers of a court-appointed CEO or receiver, the designation could have created conflict issues. However, it is quite clear that did not happen here. The orders of appointment are clear, as is the fact that the parties understood and agreed to them at the time they were issued.

*Id.* ¶ 62. Consequently, we again reject Ms. Stewart's claim that she was denied her right to a fair hearing before an impartial magistrate.

## V. DID THE DISTRICT COURT VIOLATE MADAME CHEN'S DUE PROCESS RIGHTS?

■■■ ¶ 48 Madame Chen also appeals the contempt order issued against Ms. Stewart, seeking to have it set aside to the extent that it has adversely affected Madame Chen. She identifies two different respects in which she contends the Stewart Contempt Order has violated her due process rights. First, Madame Chen points to the fact that the district court incorporated its findings of fact on the Stewart Contempt Order into its findings of fact on the preliminary injunction, which prohibits her from competing against Excel. She argues that this incorporation denied her due process because she had neither been served nor appeared as a party in the action for a majority of the days on which the district court took evidence regarding the Stewart Contempt Order and she was never notified that the findings supporting the Stewart contempt citation might be used against her. Second, Madame Chen points to the fact that the district court appointed the special master to act as the interim CEO, thus depriving her of a fair hearing before an impartial, subordinate judicial officer. Because we conclude that Madame Chen does not have standing to challenge the Stewart Contempt Order, we need not address either claim.

■■■■ ¶ 49 Madame Chen argues that she has standing to appeal the Stewart Contempt Order because she was a party to the action below, the contempt order was used against her when the district court relied upon it in issuing the preliminary injunction, and the contempt order will be considered by the district court in ruling on the pending

---

8. Ms. Stewart also argues that she was denied due process when the district court (1) improperly considered evidence other than that presented in the affidavits filed by Dr. Chen, and (2) improperly held Ms. Stewart in contempt without affording her the right to a trial by jury. Ms. Stewart raised the first issue for the first time on appeal. Consequently, we will not address it. *See Pugh v. Draper City*, 2005 UT 12, ¶ 18, 114 P.3d 546 ("It is well-established that we generally will not address issues raised for the first time on appeal unless a party can demonstrate exceptional circumstances." (internal quotations omitted)). As to the second issue, assuming Ms. Stewart was entitled to a trial by jury, an issue the parties have not briefed, this right was waived when she failed to request one. *See* Utah R.Crim. P. 17(d) ("All [nonfelony] cases shall be tried without a jury unless the defendant makes written demand at least ten days prior to trial, or the court orders otherwise.").

contempt motion filed by Excel on September 27, 2002, which seeks to hold Madame Chen in contempt. "[T]he question of whether a given individual ... has standing to request a particular relief is primarily a question of law, although there may be factual findings that bear on the issue. We will review such factual determinations made by a [district] court with deference." *Kearns–Tribune Corp. v. Wilkinson*, 946 P.2d 372, 373–74 (Utah 1997).

■■■ ¶ 50 In *Society of Professional Journalists v. Bullock*, 743 P.2d 1166 (Utah 1987), this court discussed the standing requirements that must be met by a party on appeal:

> On appeal, a party whose standing is challenged must show that he or she had standing under the traditional test in the original proceeding before the district court. In addition, an appellant generally must show both that he or she was a party or privy to the action below and that he or she is aggrieved by that court's judgment.

*Id.* at 1171 (citations omitted). To satisfy the "basic requirements" of the traditional standing test, "a party must allege that he or she has suffered or will imminently suffer an injury that is fairly traceable to the conduct at issue such that a favorable decision is likely to redress the injury." *Provo City Corp. v. Thompson*, 2004 UT 14, ¶ 9, 86 P.3d 735.

¶ 51 Madame Chen argues that she has standing to challenge the Stewart Contempt Order because that order has already been used against her in the form of the preliminary injunction and may be used against her in the future, as evidenced by Excel's pending motion to hold Madame Chen in contempt. We are not persuaded.

¶ 52 There is no dispute that the district court incorporated its findings of fact supporting the Stewart Contempt Order into its findings of fact supporting the preliminary injunction. However, in denying Madame Chen's motion to vacate on January 24, 2003, the district court clarified the source of its factual findings for both the Stewart Contempt Order and the preliminary injunction:

The litigation of this proceeding began two years ago and has included hundreds of exhibits and almost 40 days of testimony. . There exists an extensive record in this case from which the Court based its Findings of Fact and Conclusions of Law. ... The Court has concluded by the overwhelmingly persuasive evidence that the conspiracy incident to this action included Madam[e] Chen. ... Further, as a matter of clarification, the two sets of Findings of Fact and Conclusions of Law *stand independent of each other.* While the Court incorporated said Findings of Fact relative to the civil conspiracy issues into the Findings of Fact for Preliminary Injunction, the Court hereby states to the parties to clarify, *that said incorporation was not essential, and that the Court reaches the same conclusions for the relief sought by [ ] Excel on the separate Findings entered.* This Court concludes that the outcome of the hearings would not have been any different if the errors alleged by Madame Chen ... had never occurred.

(Emphasis added.)

¶ 53 Because Madame Chen has done nothing to challenge this statement by the district court, other than to state that the explanation was merely an attempt to "whitewash" the record, we accept this finding and hold that the preliminary injunction's findings of fact stand independent from those findings entered in support of Ms. Stewart's contempt citation. *See Chen*, 2004 UT 82, ¶ 76, 100 P.3d 1177 ("In order to challenge a court's factual findings, an appellant must first marshal all the evidence in support of the finding and then demonstrate that the evidence is legally insufficient to support the finding even when viewing it in a light most favorable to the court below." (internal quotations omitted)). Consequently, we reject Madame Chen's claim that she was aggrieved by the Stewart Contempt Order because it was used against her in the context of the preliminary injunction proceeding.

¶ 54 We similarly reject Madame Chen's argument that she has standing to appeal the Stewart Contempt Order because it may potentially be used against her in the future. It may very well violate Madame Chen's due

process rights if the district court relies on the findings entered in connection with the Stewart Contempt Order when considering the pending motion to hold Madame Chen in contempt. However, Madame Chen's concern over this future possibility, without more, is insufficient to establish that she has been aggrieved thus far. The district court has yet to rule on the motion requesting that Madame Chen be held in contempt. Accordingly, Madame Chen cannot establish that she has actually been aggrieved by the Stewart Contempt Order, and we therefore conclude that she lacks standing to challenge it.

## CONCLUSION

¶ 55 In conclusion, we hold that the district court erred in admitting the tape recording into evidence when Dr. Chen did not provide any evidence as to its origin. Although the district court does have the inherent authority to strike pleadings for conduct designed to improperly influence court proceedings, the issue of whether the district court properly struck Ms. Stewart's pleadings must be remanded to the district court to be determined in light of our ruling regarding the tape's admissibility. Furthermore, we hold that Ms. Stewart failed to demonstrate that the district court violated her due process rights. Finally, we hold that Madame Chen does not have standing to challenge the Stewart Contempt Order because she has failed to establish that she has been aggrieved by that order.

¶ 56 Chief Justice DURHAM, Justice NEHRING, Judge ORME, and Judge IWASAKI concur in Justice PARRISH's opinion.

¶ 57 Having disqualified themselves, Associate Chief Justice WILKINS and Justice DURRANT do not participate herein; Court of Appeals Judge GREGORY K. ORME and District Judge GLENN K. IWASAKI sat.