**2019 UT App 198**

# THE UTAH COURT OF APPEALS

NETDICTATION LLC AND ANITA KARAN,
Appellants,
*v.*
ANGELA RICE AND NRT COMMERCIAL UTAH LLC,
Appellees.

Amended Opinion*
No. 20180334-CA
Filed December 5, 2019

Third District Court, Salt Lake Department
The Honorable Todd M. Shaughnessy
No. 120905273

Donald L. Dalton, Attorney for Appellants

Stephen W. Whiting and David N. Jardine, Attorneys
for Appellee Angela Rice

Joseph M. Stultz and Daniel C. Dansie, Attorneys for
Appellee NRT Commercial Utah LLC

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

ORME, Judge:

¶1 This appeal arises from a poorly constructed provision of a promissory note that was attached to a larger, integrated contract. The first issue is a question of contract interpretation. The district court ruled in plaintiff Angela Rice's favor, granting her partial summary judgment and reserving

---

* This amended opinion replaces the opinion issued November 29, 2019, *NetDictation, LLC v. Rice*, 2019 UT App 192. Footnote 8 has been revised to correct a misstatement.

for a bench trial the determination of what constituted "a reasonable time under the circumstances" for payment. Defendant NetDictation, LLC appeals the court's grant of partial summary judgment, which we affirm. The second issue arises out of NetDictation's cross-complaint against Rice's business broker, defendant NRT Commercial Utah, LLC, which does business as Coldwell Banker Commercial LLC (Coldwell Banker). NetDictation alleged that Coldwell Banker breached the limited duty it owed to NetDictation by imperfectly conveying NetDictation's concerns about the provision of the promissory note at issue to NetDictation's attorneys, who drafted it. The district court granted Coldwell Banker's motion for summary judgment, which ruling we likewise affirm.

## BACKGROUND[1]

¶2 On December 30, 2011, NetDictation and Anita Karan (collectively, NetDictation) entered into an Asset Purchase and Sale Agreement (the APSA) to purchase a medical transcription business, Accu-Write, Inc., from Rice.[2] Coldwell Banker brokered the transaction, representing Rice.

---

1. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (quotation simplified).

2. Anita Karan was not a party to the APSA but guaranteed NetDictation's obligations and signed the contract on NetDictation's behalf.

*Rice's Claim Against NetDictation*

¶3 Section 1.3 of the APSA listed the purchase price as $98,000, of which NetDictation was to pay $5,000 as a deposit, $20,000 as a down payment, and the remaining $73,000 at closing. NetDictation was to deliver the $73,000 to Rice in the form of "two executed promissory notes," one in the amount of $25,000 (the $25,000 Note) and the other in the amount of $48,000 (the $48,000 Note). Both notes were attached as exhibits to the APSA. The APSA also contained an integration clause, which provided that the APSA (with its attached schedules and exhibits) "sets forth the entire understanding of the parties" and "supersedes all prior oral or written agreements, instruments and understandings."

¶4 The $25,000 Note stated that it was to be paid in "[a] balloon payment . . . due and payable to [Rice] on or before April 1, 2012." The $48,000 Note, on the other hand, contained a more complex repayment structure. NetDictation was to make payment on the note in monthly installments over a 24-month period, the amount of which varied depending on Accu-Write's post-sale income. The $48,000 Note provided the following method of calculating the monthly payment, hereinafter referred to as the Payment Provision:

> FOR VALUE RECEIVED, NetDictation, LLC . . . , hereby irrevocably promises and agrees to pay to the order of [Rice] . . . the principal sum of Forty Eight Thousand Dollars ($48,000.00) . . . all in accordance with the terms and conditions set forth below.
>
> 1. Monthly payments, in the amount of Thirty-Five Percent (35%) of the monthly income of [Accu-Write], . . . based on the following formula:

1.1. Fifty Thousand Dollars ($50,000.00) down payment divided by Twenty Four (24) months equals Two Thousand Eighty Three Dollars and Thirty Three Cents ($2,083.33) down payment adjustment. The average monthly income is Eleven Thousand Six Hundred Sixty Six Dollars ($11,666.00) multiplied by Thirty Five Percent (35%) equals Four Thousand Eighty Three Dollars and Thirty One Cents ($4,083.31) minus Two Thousand Eight[y] Three Dollars and Thirty Three Cents ($2,083.33) down payment adjustment comes to One Thousand Nine Hundred Ninety Nine Dollars and Ninety Eight Cents ($1,999.98) per month for Twenty Four (24) Months. This payment will be adjusted accordingly if the monthly income of [Accu-Write] increases or decreases.

¶5 The $48,000 Note further provided that in the event of NetDictation's default, Rice "may at [her] sole option consider the entire unpaid principal balance and accrued but unpaid interest . . . at once . . . due and payable without notice," and that "all amounts owing and past due hereunder, including without limitation principal (whether by acceleration or in due course), interest, late fees and other charges, shall, if permitted by applicable law, bear interest at the rate of twelve percent (12%) per annum both before and after judgment."

¶6 Following closing, Accu-Write did not maintain its past profitability. For that reason, up until the initiation of the current lawsuit, no payments came due on the $48,000 Note pursuant to the Payment Provision. Nevertheless, NetDictation made payments totaling $3,376.25 on the $48,000 Note in January, February, and March of 2012.

¶7 By April 2012, the parties' relationship had deteriorated due to Accu-Write's poor performance, and NetDictation ceased making payments on either note in June. Rice subsequently filed

suit in August, alleging that NetDictation still owed $4,000 on the $25,000 Note that had come due in April and that NetDictation had failed to pay the monthly installments on the $48,000 Note in April, May, June, and July.[3]

¶8    Rice and NetDictation filed cross-motions for summary judgment. The primary issue was whether NetDictation's duty to pay the $48,000 obligation was contingent on Accu-Write's profitability.[4] Rice argued that because the APSA provided for a fixed purchase price of $98,000, the $48,000 Note also represented a fixed amount, of which only the installment payment amounts were variable based on profitability, not the ultimate liability on the note. And to the extent the full amount was not satisfied by the end of the note's 24-month term, Rice argued, quoting *Watson v. Hatch*, 728 P.2d 989 (Utah 1986), that "the law implies that [the time of performance] is to be done within a reasonable time under the circumstances." *See id.* at 990. NetDictation, on the other hand, contended that $50,000 of the $98,000 purchase price was fixed—consisting of the $5,000 deposit, the $20,000 down payment, and the $25,000 Note—but that the balance reflected in the $48,000 Note, was "explicitly variable" under the terms of the Payment Provision.

¶9    The district court granted Rice's motion for summary judgment "in part." The court stated that the APSA,

---

3. Rice eventually conceded that payments on the $48,000 Note had not yet come due based on Accu-Write's failure to maintain its past profitability but argued that the note nonetheless came due in June 2012, on the theory of anticipatory repudiation.

4. The 24-month payment period contemplated by the Payment Provision had ended by the time the parties filed their summary judgment motions. Payment had never come due under the provision's formula.

"particularly Paragraph 1.3. and sub-paragraphs thereunder in conjunction with the Promissory Notes . . . reflected an absolute and fixed purchase amount." Although noting that "the payment terms of the $48,000 Promissory Note are undoubtedly problematic," and "it is difficult . . . to understand why they were drafted the way they were," the court nevertheless concluded that the note "reflected $48,000 defined as a principal sum," and "indicate[d] it was for a fixed amount" when read in conjunction with its other provisions—for example, those providing that the note "is transferable and allows prepayment." But because "[t]he $48,000 Promissory Note does not contain a payment schedule or balloon provision" in the event "the gross monthly income of [Accu-Write was] not sufficient to warrant a monthly payment during the 24 month period," the court concluded that "no payments would have been due until a reasonable time after the end of that period." The court accordingly granted Rice partial summary judgment, reserving for trial the determination of what constituted "a reasonable time under the circumstances" for the balance of the $48,000 Note to become due.

¶10  Following a bench trial, the district court awarded Rice the principal sum due on the $48,000 Note, interest on that amount, a $2,400 late fee, interest on the late fee, and $1,433.65 in costs,[5] totaling $76,224.49.[6]

---

5. Although the district court awarded costs to Rice, it denied her motion for attorney fees.

6. The district court did not award Rice any amount on the $25,000 Note. The court credited the $3,376.25 in premature payments on the $48,000 Note toward the $4,000 that remained owing on the $25,000 Note, and NetDictation tendered $854.54 (representing the remaining $623.75 plus interest) to Rice

(continued…)

*NetDictation's Cross-claim Against Coldwell Banker*

¶11    Approximately one month after the district court partially granted Rice's motion for summary judgment, NetDictation filed a cross-complaint against Coldwell Banker,[7] alleging that Coldwell Banker had "breached its duty of due, professional care to" NetDictation. Specifically, Rice and NetDictation had agreed to "arrange to have an Attorney prepare closing documents to consummate the transaction." To that end, Coldwell Banker arranged for a law firm (Law Firm)[8] to

---

(…continued)

sometime during the course of litigation. Because the record includes transcripts only of limited portions of the bench trial, it is unclear what the court determined to be a reasonable time for the $48,000 Note to come due, but that specific issue is not before us.

7. Rice had named Coldwell Banker as a defendant. Her claims against Coldwell Banker were conditioned on her interpretation of the $48,000 Note being rejected by the court, whereupon she intended to hold Coldwell Banker responsible for any loss. Following the court's summary judgment ruling in her favor, Rice and Coldwell Banker stipulated to a dismissal of her claims against it.

8. NetDictation also asserted claims against Law Firm in its cross-complaint. Following a bench trial, the district court entered a judgment dismissing NetDictation's claims against Law Firm, which decision NetDictation likewise appealed. But NetDictation and Law Firm settled soon after NetDictation filed its notice of appeal, and this court accordingly granted their stipulated motion to dismiss NetDictation's appeal from the judgment in favor of Law Firm.

represent NetDictation in the transaction and to draft the APSA and promissory notes in accordance with the "Offer for Purchase and Sale of Assets" agreement (the Offer to Purchase), which both parties had signed and which had the Payment Provision attached as an addendum. Although Coldwell Banker retained Law Firm to represent NetDictation in the transaction, Law Firm never directly communicated with NetDictation. Instead, Coldwell Banker apparently took it upon itself to act as an intermediary for all communication between Law Firm and NetDictation.

¶12 Law Firm drafted the closing documents and sent them to Coldwell Banker, who forwarded them to NetDictation for review. In response, referring to the Payment Provision of the $48,000 Note, NetDictation emailed Coldwell Banker raising the following concern:

> The document makes no mention of the way the "earn out" will be paid. As it stands now it seems to indicate that I owe the entire money on the day of closing. To be honest . . . , I feel like I want to use my own attorney to draft this since I just completed a deal this summer. Thoughts?

¶13 Instead of forwarding the email verbatim to Law Firm, Coldwell Banker informed Law Firm of NetDictation's concerns in a separate email, on which it copied NetDictation, stating, "With reference to [the $48,000] Note will you include the guidelines for payment I sent to you in the [Offer to Purchase] as an exhibit? It outlines how payments will be calculated and paid." Law Firm replied, but only to Coldwell Banker: "I believe I typed the provision almost verbatim into [the $48,000 Note]." Coldwell Banker then communicated to NetDictation that the Payment Provision, as it appeared in the addendum to the Offer to Purchase, had been incorporated into the $48,000 Note. Nonetheless, NetDictation notified Coldwell Banker a few days

later that it had forwarded the closing documents to another attorney for review. Although NetDictation later raised other concerns about the APSA draft, it did not raise before closing any further issues concerning the Payment Provision as it appeared in the $48,000 Note.

¶14   Soon after filing its answer to NetDictation's cross-complaint, Coldwell Banker moved the court for summary judgment. It argued that because it acted exclusively as Rice's agent, it did not owe a fiduciary duty to NetDictation, much less the "duty to second guess the legal work product of [Law Firm] who had the exclusive duty to produce the closing documents that reflected the true terms of the subject transaction." Instead, quoting *Hermansen v. Tasulis*, 2002 UT 52, 48 P.3d 235, Coldwell Banker stated that its "only dut[y] to NetDictation w[as] to be 'honest, ethical and competent,'" *see id.* ¶ 22, which it fulfilled "by providing the Offer [to Purchase] containing all terms of the subject transaction to [Law Firm] for use in drafting the [APSA]." Although NetDictation conceded that Coldwell Banker did not owe it a fiduciary duty, it argued "that Coldwell Banker failed to communicate to [Law Firm] exactly and precisely what deal was reached between the parties and/or NetDictation's concerns with the documents prepared."

¶15   The district court granted Coldwell Banker's motion for summary judgment. The court concluded that "[a]s a broker representing [Rice] in the transaction, Coldwell Banker (a non-attorney) had no duty to explain to [Law Firm] the meaning of the terms in the written agreement, or the broker's subjective understanding of the deal reached between NetDictation and Rice" when it delivered to Law Firm the negotiated and signed Offer to Purchase containing the Payment Provision and integration clause. The court also ruled that Coldwell Banker did not breach any duty to be honest, ethical, and competent in its dealings with NetDictation when it summarized NetDictation's concern about the Payment Provision instead of forwarding the

email verbatim to Law Firm. The court stated that "the most that can be said of Coldwell Banker's summary of NetDictation's e-mail is that it imperfectly communicated NetDictation's concern; but this miscommunication, even if it rises to the level of a miscommunication, is not so dishonest and deliberately misleading that it can be said to violate the limited duty a broker owes to [a] party it does not represent." Furthermore, "because NetDictation was copied on the email to [Law Firm], it had an opportunity to correct any misstatement or otherwise object to Coldwell Banker's rephrasing of its question."

¶16 The court accordingly dismissed NetDictation's cross-claim against Coldwell Banker. NetDictation subsequently filed a motion for reconsideration, which the district court denied. This appeal followed.

ISSUES AND STANDARDS OF REVIEW

¶17 NetDictation raises two issues on appeal. It first argues that the district court erred in granting summary judgment to Rice because the APSA did not unambiguously support Rice's interpretation of the Payment Provision. It next contends that the district court erroneously granted summary judgment to Coldwell Banker because conflicting evidence warranted a trial. "We review a district court's decision granting summary judgment for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 15, 367 P.3d 994 (quotation simplified). "Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quotation simplified). As to the first issue, "[t]he interpretation of a contract is a legal question, which we . . . review for correctness." *Id.* And as to the second issue, because NetDictation does not assert that the

existence of undisputed material facts precluded summary judgment, "our review is limited to determining whether the district court correctly applied the summary judgment standard in light of the undisputed material facts." *Essential Botanical Farms, LC v. Kay*, 2011 UT 71, ¶ 12, 270 P.3d 430 (quotation simplified).

## ANALYSIS

### I. Interpretation of the APSA

¶18    "A motion for summary judgment may not be granted if . . . an ambiguity exists in the contract and there is a factual issue as to what the parties intended." *Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 14, 48 P.3d 918 (quotation simplified). But "[i]f the language of the contract is unambiguous, the intention of the parties may be determined as a matter of law based on the language of the agreement." *Id.* ¶ 18.

¶19    A contract is not ambiguous "simply because one party seeks to endow [terms] with a different interpretation according to his or her own interests." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 (quotation simplified). Rather, "a contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Glenn v. Reese*, 2009 UT 80, ¶ 10, 225 P.3d 185 (quotation simplified). Additionally, because "it is axiomatic that a contract should be interpreted so as to harmonize all of its provisions and all of its terms," courts must first attempt to do so when determining whether a contract is facially ambiguous. *Gillmor v. Macey*, 2005 UT App 351, ¶ 19, 121 P.3d 57 (quotation simplified). This involves "examin[ing] the entire contract and all of its parts in relation to each other and

giv[ing] a reasonable construction of the contract as a whole to determine the parties' intent." *Id.* (quotation simplified).

¶20    NetDictation contends that because section 1.3 of the APSA "apparently" provided a fixed and unconditional purchase price, it could not be harmonized with the "earn-out"[9] language of the $48,000 Note. The district court therefore "had to imply an obligation for payment" of the $48,000 Note in the event the principal remained unpaid at the end of the 24-month period. But this, by the very nature of the missing term, "meant that the agreement was ambiguous." "Otherwise," NetDictation argues, "there would have been no need for the trial court to imply a term for payment of the $48,000 obligation that did not exist," and summary judgment was therefore improper. We disagree.

¶21    Although NetDictation correctly cites *DCH Holdings, LLC v. Nielsen*, 2009 UT App 269, 220 P.3d 178, for the proposition that "[a]mbiguity may be found when a contract is missing an essential term," *id.* ¶ 10, we disagree with its contention that the district court "impl[ied] an obligation for payment" of the $48,000 Note beyond the 24-month period. Having reviewed the APSA and the $48,000 Note in their entirety, we conclude that the district court did not imply an obligation for payment because the plain language of the documents unambiguously reflects a fixed, unconditional purchase price of $98,000, which necessarily includes payment in full of the $48,000 Note. In other

---

9. NetDictation characterizes the Payment Provision as an earn-out, which "is a contractual provision stating that the seller of a business is to obtain additional compensation in the future if the business achieves certain financial goals, which are usually stated as a percentage of gross sales or earnings." Sandra Lim, *Earnout*, Investopedia, https://www.investopedia.com/terms/e/earnout.asp [https://perma.cc/YQV7-LNNC].

words, the court did not imply a payment obligation where none otherwise existed. Rather, it implied a due date for a payment obligation where none had otherwise been provided.

¶22   NetDictation argues that the Payment Provision of the $48,000 Note conditions payment of the $48,000 obligation on Accu-Write's performance within the 24-month period. But the significance NetDictation accords the Payment Provision directly conflicts with provisions of the APSA and $48,000 Note. Section 1.3 of the APSA indicates that the parties intended the $98,000 purchase price, which necessarily includes the $48,000 Note, to be fixed and unconditional. Section 1.3 of the APSA states, "In consideration for the transfer of [Accu-Write], at the Closing, [NetDictation] shall deliver to [Rice] the purchase price of $98,000.00," of which NetDictation was to deliver $73,000 at closing in the form of "two executed promissory notes." Section 1.3 is entirely silent as to the purchase price itself being variable, as NetDictation's interpretation of the Payment Provision would have it be.

¶23   Even more telling are certain provisions within the $48,000 Note. The note states, "NetDictation . . . hereby irrevocably promises and agrees to pay to the order of [Rice] . . . the principal sum of Forty Eight Thousand Dollars ($48,000.00) (the Principal Sum), together with interest thereon (if any) and other fees in connection therewith." The note then states that it is to be repaid "all in accordance with the terms and conditions set forth below." In addition to the Payment Provision, the $48,000 Note includes an acceleration clause that provides that in the event of NetDictation's default, "the Holder may at its sole option consider the entire unpaid principal balance and accrued but unpaid interest hereunder at once . . . due and payable without notice."

¶24   The purchase price stated in section 1.3 of the APSA and the $48,000 Note's reference to the $48,000 obligation as "the

Principal Sum," along with the note's acceleration clause, cannot be harmonized with NetDictation's position on the Payment Provision. In addition to that position contradicting the $98,000 purchase price provided in section 1.3, the $48,000 Note refers to the obligation as a "principal sum," which NetDictation "irrevocably promise[d] and agree[d] to pay." Such language, especially in the absence of any express indication of the $48,000 Note's variable nature anywhere else in the contract, strongly suggests the sums represented fixed, unconditional amounts. Moreover, acceleration of the $48,000 Note upon NetDictation's default would be impossible if the obligation were anything but a set, unconditional amount. NetDictation has not provided a satisfactory explanation as to how the $48,000 "principal sum" could be accelerated if the effect of the Payment Provision was to condition not just the timing of payment but the ultimate liability for the note on Accu-Write's future profitability.[10] And

---

10. NetDictation's explanation is limited to a single sentence. After quoting the acceleration clause, NetDictation argues that "there could have been payments due during the 24-month term of the note, which would have constituted the 'unpaid principal balance.'" In other words, NetDictation argues that the provision could provide for a scheme which, upon NetDictation's default, would limit Rice's, or any subsequent holder's, demand for payment to only the past-due balance. In effect, NetDictation contends that the provision is not an acceleration clause.

We disagree with NetDictation's interpretation. An acceleration clause is "[a] loan-agreement provision that requires the debtor to pay off the balance *sooner* than the due date if some specified event occurs, such as failure to pay an installment." *Acceleration Clause*, Black's Law Dictionary 14 (10th ed. 2014) (emphasis added). *See also Acceleration*, Black's Law Dictionary 14 (10th ed. 2014) (defining "acceleration" as "[t]he act or process of quickening or shortening the duration of something, such as

(continued…)

we cannot readily conceive of a way in which to harmonize the note's acceleration clause with NetDictation's interpretation of the Payment Provision. *See Munford v. Lee Servicing Co.*, 2000 UT App 108, ¶ 18, 999 P.2d 23 ("Provisions which are apparently conflicting are to be reconciled and harmonized, if possible, by reasonable interpretation so that the entire agreement can be given effect.") (quotation simplified).

¶25    But the Payment Provision can be harmonized with the APSA and the other provisions of the $48,000 Note, thereby avoiding a conclusion of ambiguity. *See Gillmor v. Macey*, 2005 UT App 351, ¶ 19, 121 P.3d 57 ("Harmonizing conflicting or apparently ambiguous contract language before concluding that provisions are actually ambiguous is an important step in the hierarchy of rules for contract interpretation."). Specifically, interpreting the $48,000 obligation to be for a fixed, unconditional sum with variable monthly payments based on Accu-Write's income during the 24-month period avoids the problems that arise under NetDictation's interpretation of the Payment Provision.

---

(…continued)

payments"). That is exactly what this clause requires. Further, section 7 of the $48,000 Note explicitly states that the parties intended the obligation to be subject to acceleration. It provides, with our emphasis, that in the event of NetDictation's default, "all amounts owing and past due hereunder, including without limitation principal (*whether by acceleration* or in due course), interest, late fees and other charges, shall . . . bear interest at the rate of twelve percent (12%) per annum both before and after judgment." In light of section 7 expressly contemplating possible acceleration of the $48,000 Note, we reject NetDictation's suggestion that the relevant provision is not an acceleration clause.

¶26    NetDictation contends that such an interpretation nonetheless compels the conclusion of ambiguity because the court still had "to imply a term for payment of the $48,000 obligation that did not exist" if the obligation remained unpaid at the end of the 24-month term. *See id.* ¶ 18 (declining "to accept an interpretation of [an agreement] that creates new ambiguities and requires the crafting of new provisions"). But courts may, in "limited situations," read essential missing terms into a contract when those terms "are necessarily involved in the contractual relationship such that it may be said that the parties must have intended them and failed to express them only because of sheer inadvertence or because they are too obvious to have needed expression." *New York Ave. LLC v. Harrison*, 2016 UT App 240, ¶ 31, 391 P.3d 268 (quotation simplified). And implying a reasonable time for performance when no time for performance is expressly stated is a familiar example of this precept.

¶27    "An implied reasonable time limit is as much a part of the agreement as those terms that are expressed," and it has long been recognized "that if a contract fails to specify a time of performance the law implies that it shall be done within a reasonable time under the circumstances." *Coulter & Smith, Ltd. v. Russell*, 966 P.2d 852, 858 (Utah 1998). For that reason, the failure of the parties to include a provision in the $48,000 Note addressing the time frame within which NetDictation was to satisfy the obligation that remained at the conclusion of the 24-month period was not an essential term missing from the note and therefore did not create an ambiguity.[11]

---

11. To be sure, "when a contract specifically states the time for its performance, it is plain error to allow it to be performed within a reasonable time." *New York Ave. LLC v. Harrison*, 2016 UT App 240, ¶ 32, 391 P.3d 268 (quotation simplified). But this is not the situation before us. Although the $48,000 Note contemplated a

(continued…)

¶28 Accordingly, we affirm the district court's grant of partial summary judgment to Rice.[12]

## II. Duty to Be Honest, Ethical, and Competent

¶29 Although "not occupying a fiduciary relationship with prospective purchasers, a real estate agent[13] hired by the vendor

---

(…continued)

24-month term for installment payments, for the reasons explained in ¶¶ 20–27 of this opinion, that provision was limited to prescribing the time within which the payments could be varied depending on Accu-Write's monthly income. The 24-month term did not represent the time within which the $48,000 obligation was to be satisfied, if at all, although it certainly would have been possible for the sum to be fully paid within that time had Accu-Write's profitability warranted it.

12. Rice seeks attorney fees incurred on appeal. "A party entitled by contract or statute to attorney fees below and that prevails on appeal is entitled to fees reasonably incurred on appeal." *Cougar Canyon Loan, LLC v. Cypress Fund, LLC*, 2019 UT App 47, ¶ 19, 440 P.3d 884 (quotation simplified). Although Rice prevails on appeal, we deny her request on the ground that the district court declined to award her attorney fees below.

13. In *Reperex, Inc. v. Coldwell Banker Commercial*, 2018 UT 51, 428 P.3d 1082, our Supreme Court recently expressed doubt as to whether business brokers, as was Coldwell Banker's role in this transaction, share the same duty as real estate brokers because "[t]he two roles obviously differ in some respects." *Id.* ¶ 37. But apart from concluding that "a business broker should be held at least to [the] standard" of not "misrepresent[ing] material information to a buyer," the Court "le[ft] for another day the

(continued…)

is expected to be honest, ethical, and competent and is answerable at law for his or her statutory duty to the public." *Hermansen v. Tasulis*, 2002 UT 52, ¶ 22, 48 P.3d 235 (quotation simplified). NetDictation contends that the district court erred in granting Coldwell Banker summary judgment because "there was sufficient evidence of Coldwell Banker's 'dishonesty' and 'incompetence' to send the cross claim to trial." We address each theory in turn.

## A.      Dishonesty

¶30    NetDictation's contention of dishonesty is almost wholly focused on Coldwell Banker's "recharacteriz[ation]" of NetDictation's email.[14] Following its review of a draft of the

_____

(…continued)

question of the full extent of the standard of care owed by a business broker." *Id.* ¶ 38.

Although our Supreme Court issued *Reperex* approximately one month before NetDictation filed the initial brief in this appeal, neither party argues that Coldwell Banker's duty was anything other than to be honest, ethical, and competent in its dealings with NetDictation. Because neither party contends that the duty owed by business brokers differs in any way from that owed by real estate brokers, we apply that standard to this case without addressing the extent to which the two duties might actually differ, if at all.

14. NetDictation, referencing the deposition testimony of one of Coldwell Banker's agents, suggests that Coldwell Banker's alleged dishonesty was motivated by "an interest to protect its commission, and a desire to avoid contact with attorneys who could 'blow up the deal.'" The district court expressly rejected NetDictation's allegation, finding that it did not accurately reflect the agent's deposition testimony. Although the agent

(continued…)

APSA and attached promissory notes prepared by Law Firm, NetDictation emailed Coldwell Banker requesting that the Payment Provision, which had been included in the Offer to Purchase as an attachment, be included in the $48,000 Note:

> The document makes no mention of the way the "earn out" will be paid. As it stands now it seems to indicate that I owe the entire money on the day of closing.

Coldwell Banker replied that it would instruct Law Firm to include a provision reflecting the guidelines set forth in the attachment to the Offer to Purchase. Coldwell Banker also emailed Law Firm, copying NetDictation on the communication, requesting that Law Firm include the Payment Provision in the $48,000 Note:

> With reference to [the $48,000] Note will you include the guidelines for payment I sent to you in the [Offer to Purchase] as an exhibit? It outlines how payments will be calculated and paid.

Law Firm replied that it had included "the provision almost verbatim into [the $48,000 Note]."

¶31    NetDictation argues that "by re-framing [its] question, Coldwell Banker kept [Law Firm] from looking at whether the

---

(…continued)

acknowledged that "he is always concerned about the attorneys 'blowing up a deal,'" hence his usual practice of being "copied on emails of this nature," the agent "denied that he had any motivation to 'filter communications' to protect his commission." NetDictation does not argue that the existence of disputed material facts precluded the court's summary judgment order.

[Payment Provision] language of the [$48,000] Note harmonized with Section 1.3 of the APSA." NetDictation contends that by doing so, Coldwell Banker "secret[ed] known material defects." *See Hermansen*, 2002 UT 52, ¶ 23 ("[W]hen real estate professionals undertake to secret known material defects, they breach their duty to be honest, ethical, and competent and are liable for their actions."). Even assuming that the legal implications of the Payment Provisions amount to a "material defect," it is unclear how NetDictation's email would have prompted Law Firm to ensure that the Payment Provision did not contradict section 1.3 any more than did Coldwell Banker's email. NetDictation's concern, as expressed in the email, appears to have been limited to ensuring that it remained clear that payment of the $48,000 obligation was not immediately due upon closing and made no mention of the obligation itself being contingent on Accu-Write's post-sale earnings.[15]

¶32    And Coldwell Banker did no more than instruct Law Firm to incorporate the exhibit attached to the Offer to Purchase into the $48,000 Note. Karan's signature on the Offer to Purchase evidences NetDictation's prior approval of the exhibit that would later become the Payment Provision. Coldwell Banker's email did not direct Law Firm to alter the pre-approved provision in any way. To the contrary, Law Firm included "the provision almost verbatim into [the $48,000 Note]."

¶33    Furthermore, even after Law Firm had included the Payment Provision in the body of the $48,000 Note, NetDictation engaged other attorneys to review the contract and did not raise any further concerns regarding the Payment Provision.

---

15. For this same reason, we reject NetDictation's contention that Coldwell Banker handled the transaction incompetently when it summarized NetDictation's email rather than forwarding it verbatim to Law Firm.

If the Payment Provision's failure to reflect NetDictation's alleged intent to condition payment of the $48,000 Note on Accu-Write's performance escaped the review of licensed attorneys, Coldwell Banker's agent, a non-attorney, certainly cannot be expected to have understood the deficiency—a prerequisite of concealing it.

¶34 NetDictation's assertion that Coldwell Banker "secret[ed] known material defects" is further undermined by Coldwell Banker's copying of NetDictation on its email to Law Firm, thereby giving NetDictation an opportunity to clarify if Coldwell Banker had imperfectly relayed NetDictation's concerns. Although NetDictation contends that it "did not recognize the recipients of the email as the attorneys engaged by Coldwell Banker," the focus in determining whether Coldwell Banker was honest in its dealings with NetDictation is on Coldwell Banker's subjective beliefs. *Cf. Hermansen*, 2002 UT 52, ¶ 22 (stating that a purchaser can recover from a real estate agent only when "the agent had both the duty to disclose *and knowledge of the defects*") (emphasis added) (quotation otherwise simplified). NetDictation has not provided any evidence that the agent had reason to know that NetDictation would not recognize the purpose of the email based on its content and to whom it was addressed.[16]

---

16. NetDictation asserts that an agent of Coldwell Banker "admitted at trial that he knew NetDictation" mistakenly believed that Law Firm represented Coldwell Banker and not NetDictation. NetDictation does not cite the record in support of this assertion, and our review of the record has not revealed such an admission. Instead, following this assertion, NetDictation immediately pivots to the agent's testimony that he "believe[d]" he notified NetDictation that he had engaged Law Firm to represent NetDictation, referring to the response as "some vague effort to claim" that he had done so.

(continued…)

¶35 For these reasons, although Coldwell Banker's role as an intermediary between NetDictation and Law Firm appears ill-advised, under the facts of this case Coldwell Banker did not breach its limited duty to be honest in its dealings with NetDictation, a non-client.

B.    Incompetence

¶36 In arguing that Coldwell Banker "incompetently handled the transaction for both parties," NetDictation contends that Coldwell Banker violated a provision of the Utah Administrative Code, which provides:

> An individual licensee may not . . . propose, prepare, or cause to be prepared a document, agreement, settlement statement, or other device that the licensee knows or should know does not reflect the true terms of the transaction.

Utah Admin. Code R162-2f-401b(4)(a) (2011). Even assuming chapter 2f, entitled "Real Estate Licensing and Practice Rules,"

---

(…continued)

In the absence of such an admission in the record, we need not address whether NetDictation is entitled to rely on the agent's subsequent *trial* testimony when challenging the district court's grant of summary judgment to Coldwell Banker, which resulted in the dismissal of NetDictation's claims against it. *Cf. Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 15, 215 P.3d 152 ("[W]hen new material facts emerge at trial that change the nature of the [denial of summary judgment], parties then have an obligation to reraise the issue at trial in order to preserve it for appeal.").

governs business brokers,[17] *see supra* note 13, NetDictation's argument is unavailing.

¶37    NetDictation asserts that "[t]here is sufficient evidence that [Coldwell Banker's agent] may have known the APSA did not reflect the true terms of the transaction," but it does not discuss any such evidence. Although NetDictation, the non-moving party, is entitled to have "the facts and all reasonable inferences drawn therefrom" viewed "in the light most favorable" to its position, *Ockey v. Club Jam*, 2014 UT App 126, ¶ 9, 328 P.3d 880 (quotation simplified), it is unreasonable to infer that Coldwell Banker's agent, a non-attorney, knew that the Payment Provision did not comport with the interpretation NetDictation allegedly intended—especially when such deficiency escaped the detection of licensed attorneys and when the provision reflected almost verbatim the addendum NetDictation had reviewed, approved, and necessarily professed to understand by signing the Offer to Purchase. Coldwell Banker therefore did not violate rule R162-2f-401b(4)(a) of the Utah Administrative Code, if it even applies, and cannot be deemed to have been incompetent on that ground.

---

17. The sale of Accu-Write did not involve real estate but was limited to the transfer of "100% of the outstanding stock, all goodwill, trademarks and intellectual [property], trade names, telephone numbers, customer lists, transferable permits and licenses, signs, and other intangible assets" to NetDictation. Had the sale involved the transfer of any real property, it would strengthen NetDictation's position that the above-quoted administrative rule applied to Coldwell Banker. *See Reperex Inc. v. Child, Van Wagoner & Bradshaw*, 2017 UT App 25, ¶ 40, 392 P.3d 905 ("[A]t least where . . . the business being sold includes real property, the standard of care for business brokers is not lower than the standard of care for real estate brokers.").

CONCLUSION

¶38    Having reviewed the APSA and the $48,000 Note in their entirety, although noting that the contract is hardly a model of precision in legal drafting, we conclude that the district court did not err in granting partial summary judgment in Rice's favor. We also affirm the court's subsequent grant of summary judgment to the business broker, Coldwell Banker, on the grounds that it was neither dishonest nor incompetent in its dealings with NetDictation, a non-client.

—————