2026 UT App 72

# THE UTAH COURT OF APPEALS

LISA A. WILSON,
Appellant,
*v.*
BRAD J. WILSON,
Appellee.

Opinion
No. 20240444-CA
Filed May 7, 2026

Third District Court, Silver Summit Department
The Honorable Richard E. Mrazik
No. 184500216

Sara Pfrommer, Emily Adams, and
Melissa Jo Townsend, Attorneys for Appellant

Julie J. Nelson, Michael J. Teter, and Aaron R. Harris,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1      Brad and Lisa Wilson began divorce proceedings in 2018.[1] In November 2022, they engaged in mediation to resolve the division of their marital estate. At the end of the mediation, their attorneys jointly drafted an email that outlined the terms of an agreement that Brad and Lisa had reached. Very soon after, however, Brad and Lisa began disputing various issues relating to the enforceability and timing of the terms set forth in the email. Brad eventually filed a motion to enforce the agreement that had

---

1. Because the parties share the same surname, we'll refer to them by their first names moving forward, with no disrespect intended by the apparent informality.

been memorialized in the email. In her opposition to that motion, Lisa asked the court to take additional evidence on various terms that, in her view, still needed to be added. After a hearing, the district court ruled that the email constituted an enforceable, integrated agreement and that the court therefore did not need to take additional evidence. The court then made several rulings relating to the distribution, and the timing of the distribution, of various marital assets. Following additional litigation, the court issued a ruling that awarded damages to Brad based on various actions taken by Lisa that, in the court's view, had improperly delayed the distribution to Brad of (1) monies that had been in an investment account and (2) monies that were linked to various LLCs.

¶2     On appeal, Lisa first argues that the court erred by determining that the post-mediation email was a fully integrated agreement. As explained below, Lisa has not persuaded us that the court committed any reversible error with respect to this ruling. Lisa next challenges the court's decision to award damages based on her delays. For the reasons set forth below, we see no error with respect to the damages relating to the investment account, but we do see error with respect to the damages associated with the LLCs. We accordingly affirm in part and reverse in part.

## BACKGROUND

¶3     Brad and Lisa were married in 1985, and in 2018, they began divorce proceedings. The couple had three children together, but since the children were adults at the time the divorce proceedings began, the only issues to be resolved concerned the division of the marital estate.

*The Marital Estate*

¶4     Brad and Lisa's marital estate had an estimated value of over $30 million and was generally comprised of the following

assets: (1) the marital home; (2) three LLCs; (3) several Fidelity Investment accounts; and (4) various items of personal property.

¶5     For estate planning purposes, Brad and Lisa had placed ownership of the marital home in two irrevocable Alaska Qualified Personal Residence Trusts (QPRTs)—one had been formed by Brad, and the other had been formed by Lisa. Brad and Lisa's three adult children were the beneficiaries of the QPRTs. The QPRTs were formed with the assistance of Alaska estate planning counsel (Alaska Counsel) and had complicated terms. As relevant here, the QPRTs gave Brad and Lisa the right to reside in the marital home for a fixed term, after which, if they chose to stay in the home, they would have been required to pay fair market rent to the beneficiaries. The QPRTs also had detailed provisions regarding Brad and Lisa's ability to modify or amend them. Specifically, the QPRTs provided that during this fixed term, Brad and Lisa could "not make any amendments" that were "inconsistent with the settlor's intention to form and maintain a valid qualified personal residence trust." However, each QPRT provided that the trust would "cease to be a qualified personal residence trust . . . if the [marital home] cease[d] to be used or held for use as a personal residence by" Brad or Lisa.

¶6     As indicated, Brad and Lisa also jointly owned three LLCs. These were (1) Martha's Vineyard LLC; (2) Creekside Terrace LLC; and (3) Eagle Crest Condos LLC. The operating agreements for these LLCs required an independent special manager to distribute their profits equally between Brad and Lisa.

¶7     As also indicated, Brad and Lisa owned several financial accounts at Fidelity Investments (the Fidelity accounts). Two of them in particular ended up mattering in the litigation: one was an IRA in Brad's name, while the other was an IRA in Lisa's name.

*The Pre-Mediation Divorce Litigation*

¶8     Brad and Lisa engaged in several years of litigation, during which the district court entered various temporary orders

governing the management and disposition of the marital home, the three LLCs, and the Fidelity accounts. In November 2020, Lisa filed a motion for temporary relief, claiming that Brad was making "self-directed profit distributions to himself" from the LLCs. Lisa asked the court to appoint an independent special manager "to maintain the status quo" and distribute profits according to the LLCs' operating agreements. In response, the district court issued an order that appointed a special manager (Special Manager) and gave Special Manager authority to manage the assets of the LLCs. But the court "reserve[d] for later resolution . . . whether [Brad] should pay additional monthly distribution amounts" for the applicable period in which he allegedly made improper distributions.

¶9     In July 2021, Lisa filed a motion arguing, among other things, that Brad had violated the temporary orders by failing to cooperate with the parties' accountant in the preparation of the LLCs' tax returns and by pursuing "improper and undocumented tax deductions." As a result, Lisa requested "an order directing that Brad immediately pay" the LLCs, "through . . . Special Manager, all disproportionate profit distributions made to Brad of at least $383,881.10" and an "order that Brad cooperate with the filing of proper tax returns." In response, the court issued an order in October 2021 "certif[ying] for evidentiary hearing [Brad's] violation of the [temporary order]," and this order noted that this certification included "alleged disproportionate profit distributions from Creekside LLC, Martha's Vineyard LLC, and Eagle Crest LLC." The order also stated that the evidentiary hearing would "occur at trial."

*The November 2022 Mediation and Email*

¶10     In August 2022, the court issued an order requiring the parties to mediate. On November 16, 2022, the parties engaged in that mediation. After a full day of mediation, the mediator left, after which the parties' attorneys jointly drafted an email (the November 2022 email). This email was drafted on the computer of Lisa's counsel, and when the attorneys were done drafting it,

Lisa's counsel sent it to Brad's counsel, and he also copied Brad, Lisa, and the mediator. The email stated, in full, as follows:

> This documents the agreement reached today in mediation. The parties will split marital assets as follows:
>
> 1. Lisa will convey to Brad her 50% membership interest in the Creekside LLC.
>
> 2. Lisa will convey to Brad her 50% membership interest in the Martha's Vineyard LLC.
>
> 3. Brad will convey to Lisa his 50% membership interest in the Eagle Crest LLC.
>
> 4. Lisa will receive 100% ownership of the [marital] home, and all existing financial obligations (including mortgages) related to the home, and the QPRTs will be eliminated.
>
> 5. Lisa will receive $3 million of the value of the marital Fidelity accounts with Brad to receive the remaining value in such accounts.[2]
>
> 6. Brad will receive Lisa's interest in the houseboat, motorhome, and Land Cruiser.
>
> 7. Married filing separate returns will be filed in 2020 and 2021. Lisa will receive credit with IRS of one half of the estimated tax payments made (currently believed to total $182k, $91k

---

2. At the time of mediation, the Fidelity account in Brad's name was worth around $9 million, and the Fidelity account in Lisa's name was worth around $3 million.

Brad and $91k Lisa). Lisa to pay her share of tax for $100k IRA payment to Lisa in 2020 from the $91k estimated tax payments.

8. Brad to indicate to the [c]ourt and Summit County authorities that all previous civil stalking injunction compliance and violation issues have been resolved and that the divorce is settled.

9. Personal property to be reasonably split, with Lisa to receive her jewelry, the 32″ Globe, and children's books. Brad to receive his personal clothing, fishing gear, Christmas train, one-half of Christmas decorations (pre-separation), china (Brad's mother's and aunt's if in the marital home), luggage, and 20″ globe. Counsel to agree on the process for reviewing and dividing the remaining personal property consistent with existing [c]ourt orders.

10. Brad agrees to obtain an MRI and neuropsychological evaluation by qualified physician recommended by [his doctor] with expertise regarding TIAs and TBI. Medical records requested by evaluator are to be provided by Brad. Written results to be provided to Lisa, and Lisa will not distribute any of the written results to anyone without Brad's written consent.

11. Winco LLC funds to be split 50/50 with [Special Manager] to account for and control.

¶11 A few minutes after Lisa's counsel sent the email, Brad's counsel replied, stating, "Agreed. We will plan for these

provisions to take effect as of December 1, 2022. . . . [D]o you want me to write up the stipulation, findings, etc. that mimic the term provisions below?" As the attorneys were leaving for the evening, however, Lisa's counsel told Brad's counsel in person that the December 1 date was "not a term of the agreement."

¶12 At 10:20 a.m. the next morning, Brad's counsel sent an email to Lisa's counsel with a draft settlement agreement, stating:

> [P]lease see the attached draft that memorializes the agreement terms that we confirmed yesterday. If you have changes to suggest, please get those to me ASAP so that we can get this signed and filed next week. Once counsel agrees on the scope, we can circulate to clients for final approval of the written content of the stipulation. Once that happens, my office can circulate a DocuSign to make execution simple.

¶13 In response to Brad's draft, Lisa's counsel responded by noting that the email from Brad's counsel that had suggested a December 1 date "was made after the agreement was made," and Lisa's counsel reiterated that the December 1 date was "not a term of the agreement." Lisa's counsel then stated that he had told Brad's counsel as they were leaving the mediation that Special Manager "would need to stay in place . . . until the parties [could] divide the properties and implement a settlement." He also noted that "numerous documents need[ed] to be prepared to implement the separation[,] including documents to eliminate the QPRTs," and he asserted that "the parties' estate planning lawyers need[ed] to be consulted if not charged with the task of drafting such documents." He maintained that any "'deal' documents to implement the separation of property should come after the [c]ourt's order splitting the marital property." And he further indicated that he was "happy to provide input on a stipulation but [they] need[ed] to first agree upon the timing for the separation and whether dates [were] necessary to the stipulation." In a responsive email, Brad's counsel stated that the "parties did

not make any deal, whatsoever, in any of the 11 provisions . . . to unwind slowly or at Lisa's preferred pace, or that the division of the business or real estate assets required additional court approval before becoming effective," and he further asserted, "Based on the agreement provisions that you sent, the agreement is binding as of last night."

¶14 The parties' attorneys exchanged several more emails that day setting forth their views about what the parties had agreed to and what needed to take place before transferring the marital assets. During one of these emails, Lisa's counsel affirmed that, as set forth in the November 2022 email, "[t]he parties reached an agreement in princip[le] on material points." But he then noted that "we need to implement the parties' agreement and transfer marital assets to the parties after a court order is entered and pursuant to appropriate documents," after which he stated, "We expect that 12/31 is a reasonable time frame to get all that needs to be done completed." In another email that was sent on the morning of November 18, Lisa's counsel stated, "There is no disagreement that the parties have reached a settlement. . . . But we do not agree with changing the status quo or existing court orders until the parties are in a position to close an agreement that gives each side sole ownership of the marital assets as contemplated in the parties' agreement."

*The Motion to Vacate*

¶15 Later on the morning of November 18, Brad filed an expedited motion to vacate the temporary orders that were in place. Lisa subsequently filed an opposition to Brad's motion to vacate, in which she asserted, among other things, that Brad's proposed settlement agreement had neglected to include a "material term"—namely, that "Lisa could make a decision whether to proceed at all with the negotiated distribution of marital assets . . . after reviewing" Brad's MRI and neuropsychological evaluation.

¶16    At a hearing on that motion that was held on November 23, the court began by noting that Lisa's counsel had "suggest[ed]" that all of the "obligations that the parties [had] agreed to" could occur "by December 31." After listening to both parties' arguments, the court stated that it was "not prepared to terminate the temporary orders, because it's unclear . . . whether there's actually been a complete meeting of the minds about the order of operations, deadlines, and what have you." Brad's counsel then argued that "[Lisa's counsel] said December 31st, fine. Let's do December 31st." The court then explained that it was "not going to resolve today whether or not the parties [had] reached an enforceable agreement," and it ordered the parties "to reengage with [the mediator] for an additional session of mediation."

*The Motion to Enforce*

¶17    Shortly before the parties engaged in the second mediation, Brad filed a motion to enforce the November 2022 email, attaching several post-mediation emails and his draft settlement agreement as exhibits to his motion. In this motion, Brad also sought damages due to Lisa's refusal to comply with the terms of the November 2022 email. The parties participated in a second mediation on November 30, 2022, but this mediation was unsuccessful.

¶18    On January 13, 2023, Lisa's counsel sent Brad's counsel a proposed settlement agreement that was signed by Lisa. After Brad's counsel rejected this proposed agreement, Lisa filed an opposition to Brad's motion to enforce. There, Lisa first argued that the November 2022 email was a privileged mediation communication and was thus inadmissible. In the alternative, Lisa argued that even if the November 2022 email was admissible, the court should conclude that the parties had "reached no agreement" due to the fact that Brad's proposed settlement agreement "include[s] material terms never agreed to by Lisa." Finally, Lisa argued that if the court concluded that the November 2022 email was admissible and that it constituted an enforceable

agreement, the court should rule that the parties had "reached a property settlement which [could] and must be implemented in accordance with" Lisa's proposed settlement agreement (which she attached to her opposition).

¶19 One of the central concerns outlined in Lisa's opposition was how to eliminate the QPRTs.[3] Lisa maintained that Brad's proposed settlement agreement came "nowhere close" to effectuating the parties' agreement from the November 2022 email that "the QPRTs [would] be eliminated." She contended that in order to "accurately memorialize and accomplish the intent of the [November 2022 email]," the parties needed to follow advice that had been given by Alaska Counsel—specifically, that the elimination of the QPRTs "would be accomplished . . . after notice to the parties' children (the QPRT beneficiaries) and entry of a necessary [c]ourt order under Alaska Statute [section] 13.36.345 due to 'changed circumstances.'"

¶20 Lisa also contested Brad's proposal for how to distribute the funds in the Fidelity accounts. She argued that Brad's proposed settlement agreement called for her to "pay[] Brad about $142,000 from the Fidelity account with her name on it," which was "a result that [was] not consistent with the [November 2022] email's plain language"—namely, that Lisa was to "receive

---

3. As noted above, the marital home was owned by two QPRTs— one formed by Brad and the other formed by Lisa. Because each of the QPRTs included a provision stating that the person's trust would terminate "if the [marital home] cease[d] to be used or held for use as a personal residence" by that person, Brad's QPRT seems to have been eliminated in 2018 when he moved out of the marital home. Indeed, at one point in her opposition memorandum, Lisa expressed this view. But even so, Lisa's arguments about the QPRTs below were typically written in the plural (i.e., she discussed the elimination of the QPRTs), and she continues to do so on appeal. Because this ultimately makes no difference to the result we reach in this appeal, we'll follow suit.

$3 million of the value of the . . . Fidelity accounts with Brad to receive the remaining value in such accounts."

¶21 Finally, Lisa pushed back on Brad's assertion that the parties could have completed a closing on the necessary transactions by December 1, 2022. She noted that Brad had first raised that date after the November 2022 email was sent and that it was not a term of the agreement. Instead, Lisa argued that in order for her "to obtain the benefit of what she bargained for," there must be "a simultaneous receipt of one-half the value of marital property by the parties at a closing."

¶22 The court held a hearing on Brad's motion to enforce on March 14, 2023. Early in the hearing, the court ruled that the November 2022 email was "not a privileged mediation communication."[4] The court then indicated that, as it understood the current state of things, the parties' remaining disagreements were about "how to [e]ffect or enforce the terms of the parties' November 16 agreement," particularly regarding "elimination of the QPRTs, securing the $3 million held in the Fidelity accounts . . . , [and] handling of the MRI and neuropsych evaluation of [Brad] in the sequence or timing of events."

¶23 The court then asked Lisa's counsel whether he agreed that the November 2022 email was "an unambiguous enforceable agreement" "[s]uch that consideration of extrinsic evidence would be impermissible." Lisa's counsel responded that he did not. Lisa's counsel instead asserted that the November 2022 email was "missing several terms," and he asked for permission to present extrinsic evidence as to those additional terms.

¶24 Lisa's counsel stated that one of these "additional material terms" related to the MRI and neuropsychological evaluation that Brad was required to undergo (the Evaluation). Lisa's counsel referred the court to the language in the November 2022 email stating that the results of the Evaluation "would be provided to

---

4. Lisa does not challenge this portion of the ruling on appeal.

[Lisa]." Lisa's counsel then said that "a dispute" had arisen almost "[i]mmediately" after the mediation "with respect to the meaning of that." Lisa's counsel said that Lisa had "requested and contemplated" the ability to "make a go or no-go decision" on the agreement itself depending on the results of the Evaluation. Lisa's counsel said that Brad had refused to allow anyone else to see those results, however, and "[t]hat's when it fell apart."

¶25 During an ensuing dialogue with the court about this, Lisa's counsel told the court that because Lisa couldn't fully understand the meaning of those test results without assistance, Lisa had agreed to "proceed on [the] terms as mapped out" in the November 2022 email (i.e., with terms requiring Brad to submit to an exam, but without an extra provision stating that she could withdraw her assent to the agreement based on those results). Lisa's counsel further acknowledged that Lisa's proposed settlement agreement had not included a provision for her to "review" the Evaluation results. At that point, the court asked, "Well, then how integral could [that term] be?" Lisa's counsel responded, "[O]ur legal judgment and decision—it's very material. But we've taken it out because we could not get an agreement that [Lisa] could consult with medical professionals to be able to evaluate that, and we felt like we're better off in that situation with letting [Brad] do what he will with his own examination."[5]

¶26 During this hearing, the parties also discussed the elimination of the QPRTs. The court asked Lisa's counsel why Lisa hadn't yet taken steps to eliminate the QPRTs. Lisa's counsel explained that he was told by Alaska Counsel that "the way to do

---

5. It's unclear to us whether, through the statements we've quoted above, Lisa's counsel meant that Lisa had agreed to not insist on this term during the November 2022 mediation itself, or instead whether counsel meant that Lisa had agreed to omit this term when she submitted her proposed settlement in January 2023. Either way, what is clear is that Lisa's counsel was telling the court that Lisa had agreed at some point to withdraw this term.

this was to either get written consent of the beneficiaries of the QPRTs, or have a hearing and notice those beneficiaries and recognize that under a specific Alaska statute that . . . there's been a change in circumstances based upon the divorce, and the provisions could be modified." The court then asked Brad's counsel what his position was on the elimination of the QPRTs, to which Brad's counsel said that under the terms of the QPRTs, an "independent trustee" could be appointed who would have "discretion" to distribute the trust assets to Lisa. When pressed by the court as to possible objections from the beneficiaries regarding elimination of the QPRTs, Brad's counsel stated that Brad "[had] already talked to the kids and they're not going to object."

¶27 In response, Lisa's counsel asserted that Brad's approach "just seems more complicated than what [Alaska Counsel] recommended, [which was to] just get a court order under this provision for the change in circumstance [and] either get [the beneficiaries] to sign off, which is just simply signing the document, or give them notice if they don't sign it." Lisa's counsel affirmed that Alaska Counsel had told him that it didn't have to be an Alaska court that implemented the order and that "the divorce court can do it." Seemingly accepting this proposal, Brad's counsel then stated, "I think Your Honor can just enter the order at this point." Lisa's counsel then reminded the court that Alaska Counsel "said we need to give notice to the beneficiaries," but when the court asked if Alaska Counsel "[had] any legal authority for that," Lisa's counsel responded, "I didn't ask." Brad's counsel then stated that "the beneficiaries have been on notice since November [2022] that this [was] pending."

¶28 At the close of the March 14 hearing, the court made an oral ruling. The court first ruled that the November 2022 email was "an enforceable settlement agreement" that was "unambiguous on its face as a matter of law" because "Brad's counsel unambiguously responded to that email, . . . 'agreed'" and because "[t]he face of the agreement shows a meeting of the minds as to its integral terms, and [it] shows terms that are sufficiently definite and capable of being enforced." The court accordingly

denied Lisa's request to present additional extrinsic evidence about the allegedly missing terms.

¶29 The court acknowledged that the November 2022 email was "silent as to a deadline for the parties' respective performances," but it then ruled that in such a circumstance, "the law implies a reasonable time under the circumstances." The court noted that "Lisa's counsel" had previously "suggested that December 31, 2022, which was approximately 45 days in the future, would be a reasonable deadline for performance," and it further noted that Brad's counsel had "agreed that that was workable." The court thus ruled that "45 days approximately from today or on or before April 28, [2023,] is a reasonable deadline by which the parties will need to conduct a closing and tender and exchange their respective performances." In response to further dialogue with the attorneys, the court also stated that it was ordering "a simultaneous exchange, whether at closing, or earlier of the relinquishment of the LLC interests."

¶30 Turning to the elimination of the QPRTs, the court found that "there ha[d] been a substantial change in circumstances not anticipated by the settlors"—i.e., that they "did not anticipate getting divorced at that time"—and that under Alaska Statute section 13.36.345, the QPRTs "may be terminated." The court accordingly "order[ed] the parties to do so."

¶31 Finally, the court deferred ruling on Brad's still pending request for damages, concluding that it would need to hold an evidentiary hearing before ruling on that request.

¶32 On April 14, 2023, the court issued a written order that memorialized the oral ruling from the March 14 hearing. That same day, the parties transferred their respective interests in the LLCs, and they further completed the necessary documentation transferring ownership of the marital home to Lisa. With respect to the Fidelity accounts, the parties also exchanged on that same day most of the documents that would be necessary to transfer funds from Lisa's account to Brad, but this transfer was halted

when the parties began disputing the precise mechanism for the transfer (which the parties apparently believed might have tax implications) and the proper date on which to value the amounts in the accounts.

¶33　In May 2023, the court issued Findings of Fact and Conclusions of Law, along with a Decree of Divorce, which, together, settled the division of the parties' assets in terms consistent with those set forth in the November 2022 email.

*The Rule 60 Motion and Further Proceedings on Damages*

¶34　Following the entry of the divorce decree, Lisa filed a motion pursuant to rule 60 of the Utah Rules of Civil Procedure. There, Lisa asked the court to set aside the decree because, in her view, the decree had not resolved several outstanding issues, including (1) how and when to value the Fidelity accounts; (2) whether Lisa was entitled to various tax credits; and (3) who should receive various items of personal property. In the course of describing the prior proceedings, Lisa stated:

> At the March 14, 2023 hearing, the [c]ourt granted Brad's motion to enforce the November [2022 email] as a binding and complete settlement, but the [c]ourt ordered that such a settlement would be implemented not as specifically proposed by either party. The [c]ourt's oral ruling, however, adopts, in Lisa's view, only immaterial aspects of the implementation terms proposed by Brad's counsel, and instead adopts the materially different terms sought by Lisa despite Lisa's reservation that no settlement was ever reached as to all marital assets and liabilities.

Lisa also included a footnote asserting that the court had "ordered a simultaneous exchange rather than Brad's receipt of all consideration prior to Lisa's receipt of the majority of her

consideration, and the [c]ourt eliminated" the QPRTs "by [c]ourt order as requested by Lisa and as recommended by [Alaska Counsel]." In a subsequent reply memorandum on her rule 60 motion, Lisa affirmatively stated that the "parties' disputes regarding how to implement the November . . . 2022 email were also resolved by the [c]ourt largely in Lisa's favor."

¶35    The court later granted Lisa's rule 60 motion, stating that when it had entered the divorce decree, "it mistakenly understood that the parties had resolved remaining property allocation issues." The court agreed to "hold an evidentiary hearing to make the determinations necessary to fully resolve those property division matters."

¶36    A two-day evidentiary hearing was held on November 27 and 28, 2023. On the first day of the hearing, the parties presented evidence and arguments about the issues the court had agreed to resolve pursuant to Lisa's rule 60 motion. With respect to the Fidelity accounts, the parties agreed that the value of Lisa's account had been in excess of $3 million since the time of the November 2022 email (albeit at fluctuating amounts). In light of the provision in the November 2022 email stating that Lisa would receive "$3 million of the value of the marital Fidelity accounts with Brad to receive the remaining value in such accounts," the disagreement thus focused on which date should control the valuation—and, thus, how much Brad should now receive. Lisa argued that the accounts should be valued as of December 31, 2022—the date that the court had previously ruled would have been a reasonable date on which the parties could close. Brad, however, argued that the Fidelity accounts should be valued as of April 14, 2023, the date on which the parties had transferred their interests in the LLCs and the home, and on which they had exchanged some documents that, but for their last-minute dispute, would have allowed Lisa to transfer funds to Brad from her Fidelity account.

¶37    On the second day of the hearing, the court addressed the outstanding issues regarding Brad's request for damages. The

court expressed its understanding "that Lisa took the position in court beginning after the November 16, 2022 mediation through December 31st, and through the hearing on [Brad's] motion to enforce . . . , that there was no enforceable settlement agreement." Lisa's counsel corrected the court, stating that Lisa's position was that the parties had "not reached agreement with respect to all material terms" and that "there [were] conditions," but that if the court was "enforcing a settlement agreement, it [could] and should enforce it pursuant to the terms that [would] eliminate the QPRTs." The court responded, "Okay. Got it. And then there was a disagreement about how to eliminate the QPRTs. Ultimately, the [c]ourt adopted Brad's view of that, correct?" Lisa's counsel replied, "No. The [c]ourt adopted Lisa's view of that . . . . And the [c]ourt entered an order under the Alaska statute that [Alaska Counsel] had recommended."

¶38    Following the hearing, the court entered Supplemental Findings of Fact and Conclusions of Law on April 16, 2024. Early in this ruling, the court found that "[b]ut for Lisa taking the position" that the November 2022 email "was not an enforceable written agreement . . . , the parties would have closed . . . on or before December 31, 2022." The court then concluded that "the litigation positions and tactics taken by Lisa, after Brad informed the [c]ourt of the November [2022 email] settlement agreement by the parties, [were] the cause of the three and a half months of delay of the performance required" in the November 2022 email.

¶39    Turning to the Fidelity accounts, the court found that the evidence showed that the "parties made their November 16, 2022 agreement based on the values of the IRA accounts on November 16, 2022, and that the values of the accounts on that date are the values that each party understood would be the values governing the parties' bargained-for exchange." The court then concluded that because Lisa's balance on that date was $3,146,732, she "was obligated to transfer $146,732 to Brad," plus an award of statutory interest.

¶40 Finally, the court determined that because the transfers of the parties' interests in the LLCs didn't occur until April 14, 2023, "Brad failed to receive cash that he would have received had those transfers occurred on or before December 31, 2022." The court found that the income streams for Creekside LLC and Martha's Vineyard LLC (the two LLCs that Brad was awarded in the November 2022 email) from January 2023 through April 2023, plus interest, amounted to $129,828.20. The court accordingly ordered Lisa to pay that amount to Brad as damages for her delay.

¶41 Lisa now appeals.

ISSUES AND STANDARDS OF REVIEW

¶42 Lisa first argues that the district court erred by determining that the November 2022 email was a fully integrated agreement without considering any extrinsic evidence to make that determination.[6] "A determination of whether a contract is integrated begins with answering the *legal* question of whether the written expression of the parties' agreement contains a clear integration clause. If there is a clear integration clause, the integration inquiry generally ends." *Reid v. All Surface LC*, 2025 UT App 134, ¶ 31, 578 P.3d 259 (emphasis in original, quotation otherwise simplified), *cert. denied*, 585 P.3d 48 (Utah 2026). Neither of the parties here asserts that the November 2022 email contained an integration clause. Where, as here, "there is no clear integration clause, . . . a court may consider relevant parol evidence and determine as a matter of *fact* whether the writing is integrated." *Id.* (emphasis in original, quotation otherwise simplified). And when the question of integration is a question of fact, we review

---

6. Brad claims that this issue is not preserved, but we disagree. At the hearing on Brad's motion to enforce, Lisa advanced her argument that the November 2022 email was not completely integrated, and the district court later explicitly noted that Lisa had preserved this issue at the evidentiary hearing that was held in November 2023.

the district court's factual determination for clear error. *See Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 10, 182 P.3d 326.

¶43    Lisa next argues that the district court erred by ordering her to pay damages relating to her delays. As explained below, we view part of the ruling in question as turning on the district court's interpretation of the parties' agreement. We review that aspect of the ruling for correctness. *See Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 15, 367 P.3d 994 ("The interpretation of a contract is a legal question, which we . . . review for correctness."). With respect to the decision to award sanctions itself, we review that decision for an abuse of discretion. *See Raass Bros. Inc. v. Raass*, 2019 UT App 183, ¶ 11, 454 P.3d 83. An abuse of discretion "may be demonstrated by showing that the district court relied on an erroneous conclusion of law or that there was no evidentiary basis" for its ruling. *Id.* (quotation simplified).

ANALYSIS

I. Enforcement of the November 2022 Email

¶44    Lisa first argues that the district court erred by not taking extrinsic evidence before deciding that the November 2022 email was a fully integrated and enforceable contract. In her briefing, Lisa insists that she was not asking the district court to vary from the stated terms of the November 2022 email. Rather, she argues that if the court had taken extrinsic evidence, it would not have held that the November 2022 email was fully integrated and that it would have instead concluded that additional terms should be added. Specifically, she contends that extrinsic evidence would have shown that there were four additional terms (or, as indicated below, categories of terms) that still needed to be added to the parties' agreement, namely:

1.  a term setting forth the timing by which the parties would exchange their respective documents and convey their interests in the various marital assets;

2. a term establishing the mechanism by which the QPRTs would be eliminated;

3. a term allowing Lisa to withdraw her assent to the November 2022 email depending on the results of the Evaluation; and

4. additional terms governing various issues that the court had reserved for trial, including Brad's alleged misappropriation of the LLCs' profits, as well as Brad's alleged mishandling of the LLCs' tax returns.

¶45   For the reasons set forth below, we see no reversible error with respect to any of the above.

A.   Timing

¶46   In Lisa's briefing, she essentially raises two components regarding her timing claim: first, she argues that extrinsic evidence would have shown that the parties had anticipated a single, simultaneous closing, and second, she argues that evidence would have shown that the parties needed a reasonable period of time in which to complete this closing.

¶47   It's true that the November 2022 email did not explicitly establish either of these things. But in order to prevail on her claim, Lisa needs to show not only that the court erred by not taking additional evidence, but also that she was harmed by the court's failure. A "harmless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings." *Lundahl Farms LLC v. Nielsen*, 2021 UT App 146, ¶ 48, 504 P.3d 735 (quotation simplified). "If we conclude that an error is harmless, we are not required to reverse." *RJW Media Inc. v. Heath*, 2017 UT App 34, ¶ 33, 392 P.3d 956 (quotation simplified); *see also* Utah R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."). Here, Lisa has not persuaded

us that she was harmed by the court's failure to consider extrinsic evidence with respect to timing. This is so because Lisa ended up receiving both of the things that she's now claiming should have been added as terms to the agreement.

¶48   First, in the district court's March 2023 ruling on Brad's motion to enforce, the court ordered the parties to conduct a single, simultaneous closing. And in subsequent filings, Lisa repeatedly acknowledged that the court had indeed ordered this. For example, in her rule 60 motion, Lisa stated that the "[c]ourt's oral ruling . . . adopts, in Lisa's view, only immaterial aspects of the implementation terms proposed by Brad's counsel, and instead adopts the materially different terms sought by Lisa." In a footnote, Lisa more specifically stated that the district court had "ordered a simultaneous exchange rather than Brad's receipt of all consideration prior to Lisa's receipt of the majority of her consideration." Then, in her rule 60 reply memorandum, Lisa reiterated her broader view that the "parties' disputes regarding how to implement the November . . . 2022 email were also resolved by the [c]ourt largely in Lisa's favor."[7]

¶49   Second, as for Lisa's claim that there needed to be a term giving the parties a "reasonable time" in which to accomplish the closing, the district court concluded in the March 2023 oral ruling that while the November 2022 email was "silent as to a deadline for the parties' respective performances," "the law" would allow it to "impl[y] a reasonable time under the circumstances." *See NetDictation LLC v. Rice*, 2019 UT App 198, ¶ 27, 455 P.3d 625. The

---

7. Lisa's claim seems to be that a simultaneous closing should have been included in the parties' agreement. This seems slightly different from a potential claim that a party later violated its obligations by not participating in such a simultaneous closing. We don't regard Lisa as having fully briefed the latter type of claim. Regardless, the record shows that with just a few exceptions, the parties did in fact effectuate a single, simultaneous closing on April 14, 2023, and those exceptions were later resolved by the court in the November 2023 hearing.

court then noted that Lisa's counsel had originally suggested that the parties could close by December 31, 2022, which was about 45 days from the date of the November 2022 email, and that this was "a reasonable time frame to get all that needs to be done completed." In the court's view, this showed that Lisa had believed that a period of 45 days was sufficient to allow the parties to complete the closing. From this, the district court gave the parties 45 days from the hearing in March 2023—i.e., until April 28, 2023—"to conduct a closing and tender and exchange their respective performances." On appeal, Lisa does not meaningfully argue, much less persuade us, that this was an unreasonable amount of time. Thus, as with the simultaneous closing issue, it seems clear to us that Lisa ended up receiving the very thing that she is now asserting should have been memorialized in the agreement.

¶50 Given the above, we see no basis for concluding that Lisa was prejudiced by the district court's failure to consider extrinsic evidence with respect to any issue relating to timing.

B. Elimination of the QPRTs

¶51 The November 2022 email provided that "the QPRTs [would] be eliminated." During the litigation that followed, the parties expressed various views on how this was to be done. At the March 2023 hearing, Lisa's counsel stated that Alaska Counsel had recommended that the parties "just get a court order under" Alaska Statute section 13.36.345 "for the change in circumstance [and] either get [the beneficiaries] to sign off, which is just simply signing the document, or give them notice if they don't sign it." In accordance with that request, the court made a finding in its March 2023 oral ruling that "there [had] been a substantial change in circumstances not anticipated by the settlors," i.e., that they "did not anticipate getting divorced at that time," and that under Alaska Statute section 13.36.345, the QPRTs "may be terminated." The court then "order[ed] the parties" to terminate the QPRTs accordingly. In its written ruling, it further "order[ed] the parties to complete transfers as described herein to eliminate the QPRTs."

¶52　On appeal, Lisa argues that this order was "improper because (1) the QPRTs were not parties to the proceedings and (2) the district court's order misapplied the Alaska statute that it purported to rely on and accordingly did not properly eliminate the QPRTs." In particular, she contends that the court erred by disregarding her assertion "that the consent of the beneficiaries was required," noting that, in addition to Alaska Statute section 13.36.345, which allows an irrevocable trust to be terminated because of unanticipated circumstances, Alaska Statute section 13.36.360 "allows" an irrevocable trust to be terminated "by consent of the beneficiaries." She further argues that section 13.36.345 (as well as section 13.36.060) "requires that the request to terminate an irrevocable trust . . . be commenced by 'a petition'" and under Alaska Statute section 13.06.110, all "interested parties must be given notice of [that] petition."

¶53　But in the proceedings below, Lisa repeatedly assured the court that the approach she was asking the court to take was "recommended by [Alaska Counsel]." In fact, she specifically stated that Alaska Counsel had "confirmed that [the district court could] enter such an order pursuant to the parties' agreement under [Alaska Statute section 13.36.345] and that such orders are not uncommon in divorces." Lisa further represented to the court at the March 2023 hearing that Alaska Counsel had told her that it didn't have to be an Alaska court that implemented the order but that "the divorce court [could] do it."[8]

---

8. We further note that the only Alaska statute that was presented to the court in the proceedings below was Alaska Statute section 13.36.345. On appeal, Lisa does not argue that it was error for the court to terminate the QPRTs based on section 13.36.345, as opposed to section 13.36.360. Rather, Lisa's opening brief notes that "under Alaska law, a court *may* terminate an irrevocable trust" under Alaska Statute section 13.36.345 but an irrevocable trust "*may also* be terminated" under Alaska Statute section 13.36.360. (Emphases added.) And we note that under section

(continued…)

¶54 Perhaps more importantly, in various proceedings after the court's March 2023 ruling, Lisa repeatedly and affirmatively stated that the district court had now done what she had requested regarding the elimination of the QPRTs. In her rule 60 motion, for example, Lisa stated that the court had "eliminated" the QPRTs "by [c]ourt order as requested by Lisa and as recommended by [Alaska Counsel]." And at the November 2023 evidentiary hearing, she stated that the "[c]ourt [had] adopted Lisa's view" regarding elimination of the QPRTs and had "entered an order under the Alaska statute that [Alaska Counsel] had recommended."

¶55 In light of these representations to the court, we see no basis for accepting Lisa's assertions on appeal that the court's resolution of this issue was somehow improper or inadequate. Under the judicial estoppel doctrine, "a person may not, to the prejudice of another person, deny any position taken in a prior judicial proceeding between the same persons or their privies involving the same subject matter, if such prior position was successfully maintained." *Cafe Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 42, 207 P.3d 1235 (quotation simplified). And under the invited error doctrine, a party cannot obtain relief on appeal when the party had "manifest[ed] some sort of affirmative representation to the trial court that the court [was] proceeding appropriately." *State v. Popp*, 2019 UT App 173, ¶ 23, 453 P.3d 657. Both doctrines apply here, where Lisa repeatedly told the district court below what was required to eliminate the QPRTs, and where she then later repeatedly and explicitly told the court that it had properly eliminated the QPRTs pursuant to her requests. In light of those representations, she cannot now claim on appeal

---

13.36.345, consent of the beneficiaries is not required to terminate an irrevocable trust. Thus, we see no error in the court's decision to terminate the QPRTs under section 13.36.345 rather than section 13.36.360, especially when that was the statute that Lisa asked the court to apply.

that the court erred by not eliminating them in some other manner.[9]

C.     The Evaluation

¶56     Lisa next argues that the district court should have taken extrinsic evidence on whether there was an additional term that would allow her to withdraw her assent to the terms set forth in the November 2022 email once she received the results of the Evaluation.

¶57     But we note that this additional term was not included in Lisa's own proposed settlement agreement, which she sent to Brad in January 2023. Indeed, in that proposal, Lisa took out the provision from the November 2022 email that had given her the right to receive the written results of the Evaluation.[10] This at least arguably suggests that, two months after the November 2022

---

9. We acknowledge that, in the March 2023 hearing, Lisa expressed her understanding that the beneficiaries of the QPRTs (which, as noted, were the parties' children) needed to be given notice or instead affirmatively agree to the dissolution of the QPRTs. Brad told the court that this had occurred, but the court never entered a finding that it had, nor did it rule that they had been notified in a way that was meaningful under Alaska law. That said, however, after the court issued its March 2023 ruling, Lisa repeatedly told the court that it had already properly dissolved the QPRTs. Thus, even if the beneficiaries themselves could in theory challenge the dissolution in some proceeding, what we hold here is that under principles of judicial estoppel and invited error, Lisa cannot challenge the adequacy of the court's actions in this appeal because she repeatedly assured the court below that it had already done enough.

10. Under Lisa's January 2023 proposal, Brad was still required to obtain the Evaluation, but that proposal said nothing about Lisa being able to receive the results, much less withdraw her assent to the November 2022 email based on them.

mediation, Lisa did not think that there had been some prior agreement under which she was allowed to withdraw her assent based on her review of the Evaluation.

¶58 But more importantly, in subsequent proceedings, Lisa stated that she had consciously withdrawn this additional term. At the March 2023 hearing, Lisa's counsel had an exchange with the court in which he specifically affirmed that in Lisa's proposed settlement agreement, Lisa had not included a provision allowing her to "review" the results of the Evaluation because she was "willing to proceed on these terms as mapped out" in the November 2022 email "without seeing" the results of the Evaluation. Lisa's counsel explained that Lisa had decided to "take[] . . . out [this term] because [they] could not get an agreement that [Lisa] could consult with medical professionals to be able to evaluate [the results]," and "if [she couldn't] talk to a medical professional about what [the results meant], then [she couldn't] . . . exercise that provision" to withdraw her consent based on the results of the Evaluation.

¶59 Given this, even if it were true that the parties had previously agreed on this as an additional term, the above affirmations made by Lisa's counsel during the March 2023 hearing are a clear showing that Lisa had subsequently abandoned it. *See generally Lucky Seven Rodeo Corp. v. Clark*, 755 P.2d 750, 753 (Utah Ct. App. 1988) ("Abandonment means the intentional relinquishment of one's rights in the contract; and in order to nullify such rights, there must be a clear and unequivocal showing of such abandonment."). We therefore see no basis for reversing based on the district court's failure to consider extrinsic evidence about whether the parties had previously agreed to this term.

D.    Other Additional Terms

¶60 Finally, Lisa argues that there were additional issues that she "had long been concerned about that [she] had litigated over, which were not addressed by the November 2022 [email] nor

explicitly excluded," such as Brad's alleged misappropriation of the LLCs' profits (the Misappropriation Issue) and Lisa's concerns regarding Brad's handling of the LLCs' tax returns (the Tax Liability Issue). Lisa further argues that she "[was] harmed by the non-inclusion of [such] terms in the divorce decree" because "she never formally agreed to relinquish" them. In her view, "[i]t was unreasonable for the court to assume, without hearing any evidence . . . , that Lisa intended to give up on [these issues], absent a clear articulation that [they were] resolved." But Lisa has not persuaded us that there was any reversible error. This is so for two principal reasons.

¶61 First, Lisa simply has not proved her claim. When a party contends that an otherwise integrated agreement is missing terms (i.e., that the agreement is only partially integrated), extrinsic evidence "is admissible to show *what the entire contract really was*, by supplementing, as distinguished from contradicting, the writing." *Stanger v. Sentinel Sec. Life Ins. Co.*, 669 P.2d 1201, 1205 (Utah 1983) (emphasis added, quotation otherwise simplified). In the absence of any extrinsic evidence showing that the parties had actually agreed upon the missing term (or at least intended to include a specific term), the party cannot ask the court to rewrite the contract to supply the term that the parties omitted. *See Hal Taylor Assocs. v. Unionamerica, Inc.*, 657 P.2d 743, 749 (Utah 1982) (highlighting the "long-standing rule in Utah that persons dealing at arm's length are entitled to contract on their own terms without the intervention of the courts to relieve either party from the effects of a bad bargain" and holding that courts "will not rewrite a contract to supply terms which the parties omitted"); *Monaco Apartment Homes v. Figueroa*, 2021 UT App 50, ¶ 10, 489 P.3d 1132 ("The court cannot rewrite the contract because a party failed to include language to protect its rights." (quotation simplified)).

¶62 Here, at the outset of the November 2022 email, the parties wrote that the agreement would govern how the parties would split "marital assets." It's not entirely clear to us that these additional terms (i.e., those relating to the Misappropriation Issue and the Tax Liability Issue) would necessarily be part of such an

agreement. But more to the point, Lisa has not pointed to any place in the record in which either she or Brad proffered that the parties had agreed to these terms prior to or during the November 2022 mediation. For this reason alone, it appears that she was trying to add new terms, rather than present extrinsic evidence of terms on which the parties previously agreed. Thus, to the extent that her claim is about the failure to accept extrinsic evidence regarding the November 2022 agreement, it fails for lack of proof.[11]

¶63    Second, even if Lisa thought that she could present such proof in a future hearing, we conclude that principles of judicial estoppel and invited error prevent her from obtaining relief on this issue on appeal. As noted, Lisa claimed in her rule 60 motion that although the court had not "implemented" the agreement "as specifically proposed by either party," it had "adopt[ed], in Lisa's view, only immaterial aspects of the implementation terms proposed by Brad's counsel and instead adopt[ed] the materially different terms sought by Lisa." Then, in her rule 60 reply memorandum, Lisa expressed her view that the "parties' disputes regarding how to implement the November . . . 2022 email were also resolved by the [c]ourt largely in Lisa's favor." Thus, to the extent that Lisa had previously asserted that the court should take evidence on whether these additional issues were part of the November 2022 email, she was now telling the court that its ruling had given relief on all "material" terms in her favor. In light of

---

11. Indeed, the available evidence actually suggests that the parties did not agree to these additional terms during that mediation. As noted, the parties' attorneys engaged in extensive discussions via email in the days after the November 2022 mediation. But although the attorneys extensively argued in those emails about how the final decree should reflect each of the other issues we've addressed above (timing, the QPRTs, and the Evaluation), the attorneys never mentioned the Misappropriation Issue or the Tax Liability issue at all. This silence is notable, and it suggests that no one thought at the time these issues had been settled in the mediation.

this, she cannot claim on appeal that the court had actually left something out.[12]

¶64    For these reasons, Lisa has not persuaded us that the court committed any reversible error with respect to its failure to take extrinsic evidence.

## II. Delay Damages

¶65    In the March 14, 2023 oral ruling, the district court gave the parties 45 days to close on the necessary transactions, thus setting the deadline as April 28, 2023. In subsequent proceedings, the court held Lisa responsible for (1) $160,182.43, which represented the balance in Lisa's Fidelity account over $3 million as of November 16, 2022, plus interest (the Fidelity Damages), as well as (2) $129,828.20, which represented the income streams for Creekside LLC and Martha's Vineyard LLC (both of which had been awarded to Brad) from January 2023 through April 2023, plus interest (the LLC Profits Damages). Lisa now challenges these awards. We see no error with respect to the Fidelity

---

12. Even if it were true that the November 2022 email itself didn't resolve these issues, this wouldn't mean that Lisa couldn't have obtained an order from the court resolving them in some other way. Indeed, Lisa made exactly that kind of request in her rule 60 motion, asking the court there to vacate the decree so that it could rule on several other outstanding issues. But of note, she did *not* include, in her rule 60 motion, a request that the court now rule on either the Misappropriation Issue or the Tax Liability Issue. Moreover, while she did make a passing reference to the Tax Liability Issue in her reply memorandum, she didn't mention it in the subsequent hearing, and after the court didn't decide it in the rule 60 ruling, Lisa didn't file anything with the court suggesting that it had erred by failing to do so. Moreover, Lisa has not meaningfully briefed a claim on appeal demonstrating that the court erred by failing to recognize this as an issue that she had properly raised in the rule 60 litigation.

Damages, but we do see error with respect to the LLC Profits Damages.

¶66 **Fidelity Damages.** Starting with the Fidelity Damages, the November 2022 email stated that Lisa was entitled to "$3 million of the value of the marital Fidelity accounts with Brad to receive the remaining value in such accounts." However, the parties subsequently disputed when the valuation of Lisa's Fidelity account should occur. In the ruling that the court issued after the two-day evidentiary hearing, the court ruled that the parties had agreed that the Fidelity accounts would be valued as of November 16, 2022. Because Lisa's Fidelity account had a balance of $3,146,732 as of November 16, 2022, the court ordered her to transfer $146,732 plus interest to Brad.

¶67 On appeal, Lisa has not meaningfully challenged the court's determination that the proper valuation date was November 16, 2022—indeed, it's not clear that she's even trying to challenge that decision at all—nor has she challenged the court's ability to award interest on it. And with that date as the backdrop, the court's damages order relating to the Fidelity accounts did nothing more than enforce the terms of the parties' agreement. We accordingly see no error regarding the imposition of these damages.

¶68 **LLC Profits Damages.** We do, however, see error with respect to the LLC Profits Damages.

¶69 As noted, the parties did not include a clause in the November 2022 email setting a date by which the parties were required to transfer their ownership interests in these LLCs, nor was there ever a finding of any other agreement that would control this issue. This means that, unlike the Fidelity Damages, these damages appeared to be based on the court's own authority.

¶70 The record is clear enough that the court invoked this authority because of its concerns about Lisa's delay. As discussed,

the court noted that when an agreement is silent as to the time for performance, the law presumes a reasonable time under the circumstances. *See NetDictation LLC*, 2019 UT App 198, ¶ 27. With that rule as the jump-off, the court initially found that, shortly after the November 16, 2022 mediation, Lisa had proposed December 31, 2022, as a reasonable deadline on which the parties could close. From this, the court then found that it would be reasonable to give the parties 45 days to close. Lisa challenges these findings on appeal, but for the same reasons expressed above, we see no merit to that challenge. Again, on the day after the mediation, Lisa proposed December 31 as a "reasonable time frame to get all that needs to be done completed," and that was a period of about 45 days. We see no basis for overturning the district court's conclusion that 45 days was a reasonable amount of time.

¶71    This leaves the question of when the 45-day period should have started running. In its order, the district court assessed damages against Lisa for the lost income that Brad would have received from the two LLCs that he was awarded had the closing occurred on December 31, 2022. In the court's view, these damages were appropriate because, "[b]ut for Lisa taking the position" that the November 2022 email "was not an enforceable written agreement . . . , the parties would have closed . . . on or before December 31, 2022," and the court further observed that it was Lisa's "litigation positions and tactics" that prevented the parties from closing until April 2023.

¶72    But having reviewed the record, it's unclear to us what the legal or factual basis was for the court's decision to sanction Lisa for taking these positions in the litigation. Under rules 11(b) and (c) of the Utah Rules of Civil Procedure, a court can award sanctions if litigation was done for an "improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." But the court never found that Lisa's litigation had met this standard. Separate from rule 11, Utah caselaw allows courts to impose sanctions based on the courts' statutory and "inherent authority to punish contemptuous

conduct." *Chen v. Stewart*, 2005 UT 68, ¶ 36, 123 P.3d 416; *see id.* ("A court's authority to sanction contemptuous conduct is both statutory and inherent."). But there was no finding of contempt by the district court. Nor, for that matter, was there any finding that Lisa had engaged in bad faith litigation or "abuse of the [legal] process," *see* Utah Code § 78B-6-301(4), which could in theory have provided a separate statutory basis for assessing these damages.

¶73　To be clear, we stress here the difference between the Fidelity Damages and the LLC Profits Damages when it comes to timing. The Fidelity Damages were based on a valuation date that, according to the court's unchallenged finding, was the product of an agreement by the parties. But the LLC Profits Damages were not. Instead, they were based on the court's own determination of when it would have been reasonable for the parties to have closed. While we've affirmed the conclusion that it would have been reasonable to close within 45 days, those 45 days needed to start running at some point. In its damages ruling, the court seems to have fixed that date as the November 2022 mediation. But in the months between that mediation and the March 2023 ruling, the parties were litigating various issues—which the district court did not state were improper or abusive to pursue—that would have impacted that closing, such as what the terms of the November 2022 agreement even were and whether the agreement was binding. It wasn't until the March 2023 ruling that those issues were resolved. Indeed, in that ruling, the court officially started the 45-day clock and gave the parties until April 28, 2023, to close.

¶74　On this record, we see no legal or factual basis for holding Lisa responsible for the LLC income that Brad lost between January 2023 and the date on which the parties closed. We accordingly reverse and vacate the portion of the court's decision that awarded those damages and remand with instructions for the court to enter a damages award based solely on the Fidelity Damages.

CONCLUSION

¶75　For the reasons set forth above, we see no reversible error stemming from the district court's failure to consider extrinsic evidence regarding the November 2022 email. We also see no error in the district court's award of the Fidelity Damages. But we do see error regarding the court's imposition of the LLC Profits Damages, and we accordingly reverse and vacate those damages and remand for further proceedings.

---